IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____<br><br>UNITED STATES OF AMERICA<br><br><br>v.<br><br>JOSEPH PONZO and<br>CHRISTOPHER PONZO,<br><br>Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)  Case No. 22-cr-10094-NMG<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT CHRISTOPHER PONZO'S SENTENCING MEMORANDUM

### I.      Introduction

Defendant Christopher Ponzo, having accepted responsibility and pleaded guilty, respectfully submits this memorandum in advance of his sentencing hearing on February 5, 2025.

Given the facts and circumstances of this case, the nature of the charges, Mr. Ponzo's background, and the proportionality of sentences imposed on defendants with similar records convicted of similar conduct, Mr. Ponzo submits that a sentence of probation and substantial community service is fair and reasonable and will ensure that punishment of Mr. Ponzo for his criminal conduct is "sufficient, but not greater than necessary" to achieve the goals of sentencing as required by 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 245 (2005); *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008).

## II.   Personal History

### a.   Personal Background

Chris Ponzo[1] was born and raised in a middle-class family in Stoneham, MA.  He is the second of three children born to Joseph Ponzo, Sr. and Marie Ponzo, who divorced in the 1990s. His father worked as carpenter and his mother as a crossing guard.  He was very close to his family, including his older brother, Joe (his co-defendant in this case).

Chris developed a strong work ethic and entrepreneurial spirit from an early age.  He graduated from Northeast Metropolitan Regional Vocational High School in Wakefield, MA in 1992.  Later, he attended the Peterson School in Woburn, MA where he took electrical and HVAC courses.  While in school, he worked three jobs, delivering newspapers, working at a hospital, and running a DJ business that he started.  Using money saved from his DJ business, Chris purchased a few small, multifamily apartment buildings on the North Shore which he managed as investments, relying on his trade skills to upkeep the buildings on his own.

Chris has been married to Nicole Ponzo (née Melino) since 2010.  He currently lives with Nicole; their three children, Christian (age 12), Calvin (age 9) and Julian (age 2); and Nicole's parents, in North Reading, MA.  Chris is a very active, hands-on father, who regularly drops off and picks up his two older children from school, and takes them to their various extracurricular activities, while his wife is caring for their two-year old son.

### b.   Service to the Community

Chris is and has always been incredibly generous with both his time and money.  He regularly volunteers at his children's school, St. Joseph's School in Wakefield, including helping to coach track and basketball; organizing the craft fair, the Halloween Stroll, the Christmas

---

[1] This memorandum refers to the Defendant Christopher Ponzo as "Chris Ponzo" to distinguish from his brother Joseph (or Joe) Ponzo.

Stroll/Pageant, and the pancake breakfast; buying Christmas trees for each classroom; dressing up as Santa Claus and the Easter Bunny; organizing the school play and building the sets; participating in Field Day; chaperoning school trips; and volunteering in the classrooms. Chris also regularly volunteers his time and money to the Boys & Girls Club of Wakefield. Chris and his brother Joe also organize an annual Christmas "sleigh ride" every Christmas Eve where they deliver gifts purchased with their own money to dozens of less fortunate families.

Beyond these volunteer activities, Chris regularly goes out of his way to support friends, family and members of his community, financially and otherwise. He gave $30,000 to his son's pre-K teacher who lost her job, $10,000 to a widowed neighbor, $10,000 to a family whose father died, and $5,000 to a man battling cancer. *See* Ex. 2; Ex. 3; Ex. 4; and Ex. 5. He is not only generous with his money but also his time. He spent hours helping a friend to fix a furnace which unexpectedly quit on the night before house was to be sold. *See* Ex. 1 at CP-047. He performed home repairs for a single mother who is a commercial tenant of his, free of charge, to ensure they had safe drinking water. *Id.* at CP-066. He sent an employee of his to a teacher's home to fix a stairlift for her husband after his knee replacement, also completely free of charge. *Id.* at CP-064. These are just a few of countless examples of Chris going above and beyond to serve his community, out of the goodness of his own heart. A collection of more than 120 letters of support from Chris' friends, family, business associates, and community members speaking to his character and good deeds is attached as Ex.1. The content of these letters is discussed in detail in section V(e) below.

### c. Electrical Associates/CAP Electric

In 2011, Chris' father-in-law, Bob Melino, who was a master electrician, introduced him to CLEAResult (then known as CSG). Mr. Melino had worked for CSG for years as a contractor

3

doing work under the Mass Save program, and explained to Chris how lucrative the work was. Mr. Melino introduced Chris to his contact at CSG, Eric Darlington, who explained to Chris how he could become a contractor for CSG.  Chris, who did not have an electrician's license, partnered with his brother Joe's father-in-law, Bob Oliphant, to contract with CSG to do Mass Save work through Mr. Oliphant's company, Electrical Associates, LLC.  In 2016, after Mr. Oliphant and Chris decided to part ways, Chris established CAP Electric, Inc., partnering with master electrician Patrick Walsh, to continue to do Mass Save work through CSG (which by that time had been acquired by, and was known as, CLEAResult).

Upon becoming approved as a CSG/CLEAResult Mass Save contractor in 2011, Mr. Ponzo's first Mass Save jobs were performing lighting upgrades at the multifamily apartment buildings that he owned and managed.  After those jobs were complete, Chris began reaching out to property managers at large development companies which owned or managed multifamily apartment buildings in Massachusetts, to educate them on the Mass Save program (including, principally, that the program provided them with free or low-cost upgrades that would lower their monthly energy bills), and to solicit their business.  *See* Ex. 6; Ex. 7; Ex. 8; Ex. 9; Ex. 10; Ex. 11; Ex. 12; Ex. 13; Ex. 14; Ex. 15; Ex. 16; and Ex. 17.  Through his persistent efforts, Chris convinced decisionmakers at companies such as Symes Properties, Corcoran Management, Wingate, Bozzuto, AvalonBay, and others, to hire Chris' company to perform energy efficiency upgrades through the Mass Save program at some of their properties in Massachusetts.  *See id.* Chris did good work, and over time, developed relationships with these companies which led to a large volume of repeat business.  As Mark Delisi of AvalonBay Properties, one of Chris' biggest customers, testified, he chose CAP Electric to perform all lighting upgrade work through Mass Save at all AvalonBay properties in Massachusetts because Delisi trusted Chris, he had a good

4

relationship with the on-site property managers, and he did good work.  Ex. 18 at 30.  Chris

developed similar relationships with other developers, all of whom spoke very highly of Chris

and the work his company performed.  *See* Ex. 19; Ex. 20; Ex. 21; Ex. 22; and Ex. 23.

### III.    The Offense Conduct

#### a.  The Mass Save Program and CLEAResult

Mass Save is an umbrella brand under which participating utilities such as Eversource

and National Grid perform energy efficiency upgrades for their customers at little or no direct

cost to the customer.  The program is funded by a small surcharge that is added to all utility

customers' monthly bills.  Those funds are then distributed by the utilities to "lead vendors" like

CLEAResult who retain contractors to install the energy improvements, such as energy efficient

lighting or air sealing.

CLEAResult is a private, for-profit company which was a "lead vendor" in the Mass

Save program.[2]  In that role, it was to identify customers, perform a free energy audit and

assessment of a potential customer's property and then propose energy improvements such as

energy efficient lighting and air sealing.  Most of its customers came via referrals from

participating contractors.  Ex. 27; Ex. 28.  CLEAResult would then submit a proposed contract to

the customer for the work to be done at either no cost or partial cost to the customer (depending

on the type of building and the nature of the improvements).  Once the customer agreed,

CLEAResult would assign a contractor to perform the work.  For customers who were referred

by participating contractors, the referring contractor would be assigned to complete the work for

those customers.  Ex. 29 at 37; Ex. 30 at p. 4; Ex. 31 at p. 7; Ex. 32 at 2; Ex. 33.

---

[2] CLEAResult entered the Massachusetts market though its acquisition of Conservation Services
Group ("CSG") in 2015, and inherited contracts that CSG already had in place with Eversource
and National Grid to administer the Mass Save program on their behalf.

The contractors were paid according to a pricing schedule included in CLEAResult's contracts with the utilities. *See* Ex. 57 at USAO_NG_00000415-419; Ex. 58 at USAO-0041612-41615. Lighting installations were paid according to a set amount for each fixture installed; air sealing was paid by the hour or by square footage. *Id.* According to the contracts between the utilities and CLEAResult, CLEAResult was paid an "audit fee" of between $60 and $70 per dwelling unit in which improvements were installed. Ex. 57 at USAO_NG_00000419; Ex. 58 at USAO-0041610. In the case of Multifamily properties with hundreds of units (as relevant to this case), this fee could be substantial. In addition, CLEAResult was paid a "program management fee" by each utility for its work on the multi-family program. For National Grid, CLEAResult was paid a fee equal to 15% of the cost of installed improvements on each project. *See* Ex. 57 at USAO_NG_00000419. For Eversource, this was paid as a flat monthly fee which ranged from approximately $20,000 to $40,000 over the life of the contract (as amended from time to time). *See* Ex. 58 at USAO-0041610.

### b. Chris Ponzo gave business to CLEAResult; not the other way around.

The government portray this case as a "money for contracts" case. It is anything but. In reality, it was Chris Ponzo, through his own hard work and persistence, based on relationships with property managers that he developed and cultivated, who generated virtually all of the Mass Save Multifamily program jobs which Electrical Associates/CAP Electric performed through CLEAResult. Chris brought the jobs to CLEAResult; not the other way around. As CLEAResult's former Multifamily Program Manager Bill Footer testified, Mr. Ponzo was "bringing in properties from two management companies [Avalon Bay and Bozzuto] that were like nationwide management companies that properties in multiple states. And…some of them were like around 500 units, somewhere down to like 200 units. But all of them were over 100

units." Ex. 24 at 11-12.  As explained above, in just one such example, Chris developed an exclusive relationship with AvalonBay, who insisted that only the Ponzo brothers perform Mass Save work at their properties.  *Id.* at 12.  Chris Ponzo performed at least thirty-four Mass Save jobs through CLEAResult at AvalonBay properties.  *See* Ex. 25.  Chris developed similar relationships with and brought in hundreds of other jobs from Symes Properties, Corcoran Management, Wingate, Bozzuto, AvalonBay, and others.  *See* accompanying Declaration of Christoper Ponzo at Exhibit A.

Although he was one of CLEAResult's largest generators of business, *see* Ex. 26, Mr. Ponzo was not unique in this regard.[3]  According to CLEAResult, "*the vast majority of the Multifamily Residential projects are self-generated leads by participating contractors*."  Ex. 27; *see also* Ex. 28 ("In Massachusetts, most of the multi-family residential work is brought to CR by contractors.").  Indeed, it was CLEAResult's policy that a contractor who generated a customer lead was entitled to work the resulting contract.  Ex. 29 at 37 ("*If a contractor brings a customer into the program, which is pretty common, we don't – we don't take work.  You know, that's their customer.  We wouldn't take that away*.");  Ex. 30 at p. 4 ("Mass Save HES encourages contractors (IIC & HPC) to <u>bring your own customers into the Program</u>" [emphasis in original]); Ex. 31 at p. 7 ("IIC [Independent Installation Contractors] may pre-qualify customers, 'tag' them, and refer them to the Mass Save Program," with "CSG return[ing] approved work scope to IIC");  Ex. 32 at 2 ("*If a contractor referred a project to CLEAResult, they would complete that project*.");  Ex. 33 (Bill Footer writing: "he [Chris Ponzo] brought the leads so he gets the work"); *see also* Ex. 29 at 16 (Kevin Cote testifying that the customer gets to choose which contractor performs the work).

---

[3] CAP Electric ranked fourth among Multifamily Program contractors in revenue generated in 2017 at $2,182,988.  *See* Ex. 26.

### c. Joe Ponzo formed Air Tight to take advantage of a business opportunity and help his brother Chris fill an unmet need.

After several years of working with CLEAResult on Mass Save projects, and with a long backlog of customers waiting for both lighting upgrades and air sealing work, Chris realized that there was a business opportunity for his brother Joe to get involved doing air sealing work. Chris was tired of fielding complaints from property managers about the lack of professionalism of CLEAResult contractors performing air sealing work, which reflected poorly on Chris and his companies because the property managers incorrectly presumed the air sealing contractors were affiliated with Chris and his company. Bringing on board his brother Joe, whom he trusted, was the perfect solution to this problem.

The government makes much of the fact that Joe Ponzo had no prior experience in air sealing work. But none was required. The bar to becoming a CLEAResult-approved contractor was not high. In the words of the current director of CLEAResult's Multifamily Program, Kevin Cote, "one of the objectives of the programs is to grow the number of contractor participants. CLEAResult has an open door policy with contractors as long as contractors submit a participation agreement and pass the background [check]." Ex. 28 at p. 3. The only prerequisites to being a CLEAResult approved contractor were insurance and basic licensure. Ex. 29 at 17-18; *see also* Ex. 34 at ¶ 17 (explaining that all that CAP Electric's predecessor, Electrical Associates, needed to get approved as a CLEAResult contractor was a certificate of insurance and a W-9 form). Accordingly, if a CLEAResult customer had a preferred contractor who they wanted to perform Mass Save work at the customer's property, CLEAResult would

8

approve that contractor into the program provided they met the basic licensure and insurance requirements.  *Id.*[4]

### d.  Chris Ponzo paid Darlington and Marra to incentivize them to do their jobs.

Chris admits he made payments to Darlington and Marra.  But he did not make those payments in exchange for contracts.  As Chris attests in his attached declaration, of the 340 Mass Save jobs that his company performed for CLEAResult in from 2014-2020, he brought 273 of those jobs to CLEAResult, not the other way around.[5]  Because the jobs he brought in were big and the jobs given to him were small, the share of Electrical Associates' and CAP Electric's *revenue* which resulted from jobs which Chris originated and brought to CLEAResult (or which were assigned to him by CLEAResult employees other than Darlington or Marra) is even higher, at **98.7%**.  *See* accompanying Expert Declaration of Rebecca Greco at ¶ 19 and Fig. 1.  As set forth above, it was CLEAResult's firmly-established policy that if a contractor brought in a job, that contractor got to complete the job.  Chris did not need Darlington and Marra to give him contracts.  What he did need was for Darlington and Marra to be properly incentivized to be as productive as possible in performing the energy audits and processing the contracts that Chris brought in (i.e., doing the necessary paperwork), so that Chris could actually do the work.

The government has pointed to examples of what they claim are Chris asking Darlington to provide him with contracts.  In fact, as Chris has attested, s*ee* Ponzo Decl. ¶ 6, and as the emails themselves unmistakably demonstrate, when Chris would ask Darlington or Marra to send him contracts, all he was asking them to do was to complete the paperwork necessary to process

---

[4] It is undisputed that Christopher Ponzo, through his company Electrical Associates, became an approved CLEAResult contractor in 2011, before he ever made any payment to (or agreed to pay) Eric Darlington or Peter Marra.

[5] Of the 67 jobs that Chris did not bring in, 44 were assigned to him by CLEAResult employees other than Darlington or Marra.  *See* Ponzo Decl. at ¶ 4 and Exhibit A.

customer contracts *that he brought in* so that he could commence the work.  See Ex. 35; Ex. 36; Ex. 37; Ex. 38; Ex. 39; Ex. 40; Ex. 41; Ex. 42; Ex. 43; Ex. 44; and Ex. 45.  These and other emails produced in discovery show that Chris was constantly urging Darlington and Marra to stay on top of their workflow, so that he could keep his customers happy.  See *id.*; Ex. 46; Ex. 47; Ex. 48; Ex. 49; and Ex. 50.[6]  Marra confirmed as much in his FBI interview, explaining that he understood Chris gave him cash and gifts for "keeping the jobs straight," not for contracts; that Chris generated most of his own work; and that it was not given to him by Marra.  Ex. 54 at ¶ 17.

Chris knew that Darlington and Marra were, in Marra's own words, "overworked and underpaid," Ex. 54 at ¶ 24; he knew they had received no commission or bonus or other incentive compensation based on their productivity, *see* Ex. 32 at 2; and he knew that unless he supplemented their income, they would have little incentive to put in the extra effort that was required to stay on top of the large volume of work that Chris was bringing to CLEAResult.[7]  Chris also regarded paying them as a matter of fundamental fairness; he was doing well (as was obvious to Darlington and Marra), so Darlington and Marra should do well too.

### e.  The government's allegations of "overbilling" are directly contradicted by the evidence.

The government alleges that Air Tight (not CAP Electric) overbilled CLEAResult by billing it for more hours than it took to complete air sealing work on a given job, and by charging CLEAResult a higher hourly rate than Air Tight paid to its subcontractors to perform the work.  The government claims that the difference between the amount which Air Tight paid to its

---

[6] All of this was fully consistent with CLEAResult's corporate objectives which were to complete as many jobs and make as much money as possible.  *See* Ex. 51; Ex. 52; and Ex. 53.

[7] Darlington made around $62,000, while Marra made around $78,000.  Neither received any form of incentive compensation from CLEAResult.  *See* Ex. 32 at 2.

subcontractors for a given job, and the amount of money which it billed CLEAResult for that same job, constitutes "overbilling" and represents a loss to CLEAResult, or to the participating utilities. The government's theory of "overbilling" upon which their allegations of loss/gain are predicated is fundamentally flawed and directly contradicted by the actual evidence.

First, as the government's cooperating witness Eric Darlington testified, it was CLEAResult's standard policy, set by Darlington's bosses, to approve four hours of air sealing per residential unit and eight hours per attic. Ex. 55 at 67-68; 71 ("Q. I just want to clarify, that 4 hour figure for the air sealing, like 4 hour per unit, that 4 hours was set by CLEAResult; correct? A. Correct."). Further, it was CLEAResult's policy to pay the approved amount of hours for air sealing jobs, regardless of how much time the job actually took. In the grand jury, the government asked CLEAResult's current program director for the Multifamily Program, Kevin Cote: "What if it is later determined that, 'wow, this job I specced it at four hours, but, wow, it was super easy. They finished every unit in under an hour.' What happens then? Are they still entitled to that four hours per unit?" Ex. 29 at 28-29. In response, Mr. Cote explained, much to the government's chagrin, that the price quoted for air sealing jobs is a "fixed price" which is not subject to adjustment based on the actual time the job took, and, as a result, "there are winners and losers sometimes." *Id.* (When asked about a particular Air Tight air sealing job in Watertown which was quoted at $62,000, Mr. Cote confirmed that the quoted price was a fixed price; it was not subject to adjustment if the project took less time than was quoted). Finally, the hourly rate paid for air sealing was set by contract between CLEAResult and the utilities. Ex. 56 at 8. For example, the contract between CLEAResult and National Grid for the period July 2016

through December 2020 set a price of $84/hr for air sealing.  *See* Ex. 57 at

USAO_NG_00000418.[8]

Accordingly, based upon the above-cited evidence, there is absolutely no factual or legal

basis for the government to allege that Air Tight "overbilled" or somehow defrauded

CLEAResult or the utilities by issuing invoices based upon the number of hours approved, rather

than the actual time expended.  If Air Tight was guilty of "overbilling," then so too was every

other air sealing contractor who did work Mass Save work for CLEAResult.  This point is so

obvious that even one of the grand jurors remarked, in response to the government's suggestion

that Air Tight had overcharged CLEAResult, "*that sounds like it is CLEAResult's issue rather*

*than Air Tight Solution[s] overcharging*."  Ex. 29 at 46.  Likewise, there is no basis for the

government's allegation that Air Tight overbilled CLEAResult because it paid its subcontractors

something less than what it got paid by CLEAResult for each job.  CLEAResult policy permitted

the use of subcontracted labor, *see* Ex. 28 at 3, and, obviously, regardless of whether it used

subcontracted labor or employee labor, Air Tight was entitled to earn a profit.[9]

---

[8] The price paid for the installation of lighting fixtures (i.e., the type of work performed by CAP
Electric) was also established as a matter of contract between CLEAResult and the utilities.  *See*
Ex. 57 at USAO_NG_00000415-419; Ex. 58 at USAO-0041612-41615.  It was a set dollar
amount per fixture.  *See id.*

[9] CLEAResult's current Multifamily Program director Kevin Cote stated in his FBI interview
that CLEAResult contractors such as Air Tight could use subcontractors if those subcontractors
signed a participation agreement with CLEAResult, although he could not identify the source of
that supposed requirement.  Ex. 28 at 3-4.  Even if Cote was correct about such a requirement,
the fact that Air Tight's subcontractor, Chinasa, did not have a participation agreement has no
bearing on whether Air Tight "overbilled" CLEAResult or caused a pecuniary loss to
CLEAResult or the utilities.  In fact, although it is irrelevant to whether or not there was a loss, it
is notable that Chinasa's principal, Larry Fernandes, was actually identified in Air Tight's
participation agreement as the person who would be performing the work (although he was
erroneously listed as an employee of Air Tight rather than a subcontractor).  Ex. 29 at 21.

The government has no evidence that CAP Electric did not perform the work they were contracted and paid to do, nor can they even point to any issues with the quality of CAP Electric's work, save for a single instance of uninstalled lightbulbs. The government points to an isolated incident in which an employee of Eversource, Marge Kelly, performed an unannounced "spot check" of a property in the Seaport and discovered there a pallet of lightbulbs which CAP Electric allegedly failed to install.[10] The government's reliance on this single, minor, supposed incident underscores the complete absence of evidence that CAP Electric did not do exactly what it was paid to do, much less that any substandard work was somehow a systemic byproduct of a criminal conspiracy.[11] Indeed, following the discovery of the pallet of lightbulbs, a review of CAP's other jobs was performed (including by a third-party audit company) and no discrepancies or issues were identified. Ex. 59 at 5; Ex. 56 at 37. Kelly herself could not recall observing any other issues with work performed by CAP. Ex. 56 at 36. After the lightbulb pallet "incident," Kelly claims she directed CLEAResult not to allow CAP Electric to work any more Eversource jobs other than jobs which CAP brought in itself. Ex. 59 at 4. Since CAP brought in virtually all of its own jobs, this edict (to the extent CLEAResult even heeded it at all)

---

[10] Ms. Kelly's interviews with the government and grand jury testimony makes clear that she had an axe to grind with CLEAResult. She described CLEAResult's program manager for the Multifamily Program (and her primary contact at CLEAResult), Bill Footer, as "lazy" and "asleep behind the wheel for years," and complained that he "gave too much freedom to the Field Property Managers such as Darlington," "did not take Kelly, or her input, seriously," and "pushed back on process improvements" recommended by Kelly. Ex. 59 at 3-4. She criticized Darlington too, saying that his work was "unsatisfactory" and that he "often took shortcuts." *Id.* at 3. When Footer did not respond to her concerns about Darlington in the way she wanted, she went over Footer's head to one of the top bosses at CLEAResult, Bob Eckel. *Id.*

[11] The reality is that the pallet of lightbulbs was delivered in this fashion at the request of building management, who had been unable to coordinate access to individual units at the time when CAP was working at the property implementing upgrades to common areas. CLEAResult knew that it was not always possible for contractors like CAP to gain access to individual units to swap out bulbs, because this required the consent of unit occupants. There was nothing improper much less criminal about this.

had no meaningful impact on CAP's work for CLEAResult, and indeed, CAP continued to perform a large volume of work for CLEAResult right up until CLEAResult terminated their relationship when the indictments were handed down in this case in April 2022.

## IV.    Application of the Sentencing Guidelines

Chris and Probation agree that section 2B1.1 applies to Chris' conviction for honest services fraud, and that, with the appropriate adjustments, Chris' total offense level is a **3**, which, given his criminal history category of I, generates a guideline range of 0 to 6 months.  The government disagrees.  The government contends that section 2B4.1 applies and that, when taking into account what they say is a $16.8 million gain to Mr. Ponzo from the offense (plus a number of other upward adjustments which they claim apply), that Chris' total offense level is **31**.  The government is wrong both as to the applicable guidelines section and as to its calculation of gain from the offense—gain which under a correct application of the guidelines is irrelevant in any event.  The government's other challenges to Probation's application of the guidelines are equally without merit, for the reasons explained below.

### a.    The Fraud Guideline, § 2B1.1, Applies to Private Sector Honest Services Wire Fraud Cases Like This One.

Undeterred by its loss on this very issue in the "Varsity Blues" cases, the government once again argues that Guidelines § 2B4.1, rather than § 2B1.1, applies to this conviction for private sector honest services wire fraud.  The Government's argument is contrary to the plain language of the guidelines, Probation's reasoned analysis originally performed for the Varsity Blues cases, Judge Talwani's decision in *United States v. Abbott,* 2019 WL 4394934 (D. Mass. Sept. 13, 2019), and the rulings of at least three other judges in this district in Varsity Blues

cases, including this Court in *United States v. MacFarlane*, 19-cr-10131-NMG.[12]  The

government in its objections to the Presentence Report makes absolutely no mention of this

contrary authority, relying instead on the same outdated precedents applying prior versions of the

guidelines which they unsuccessfully invoked in the Varsity Blues cases and which Judge

Talwani in *Abbott* expressly found to be inapposite.  *See Abbott*, 2019 WL 4394934 at *2 n.1.[13]

---

[12] The transcript of Mr. MacFarlane's November 13, 2019 sentencing is attached hereto as Ex. 60.  The Court stated that it "agree[d] in principle with the opinions of the other three Judges of this Court who have previously determined that the fraud/deceit guideline; that is, 2B1.1, is applicable, not the commercial bribery guideline, which is 2B4.1, and that there is no specific loss or gain to be applied under the fraud guideline."  *Id.* at 4.  The "other three Judges" which the Court was referring to were Judge Talwani in *Abbott*, Judge Woodlock in *United States v. Blizzack*, 19-CR-102222-DPW (ECF No. 34), and Judge Zobel in *United States v. Vandemoer*, 19-cr-10079-RWZ (ECF No. 26).

[13] There, regarding the very same precedents which the government erroneously relies upon here, Judge Talwani wrote:

> [T]he government still contends that "the First Circuit and at least four other circuits have in similar circumstances applied USSG Section § 2B4.1." *See* Government Mem. 14 and n. 25 [#422] (citing *United States v. Poirer*, 321 F.3d 1024, 1035 (11th Cir. 2003)); *United States v. Rybicki*, 38 F. App'x 626, 633 (2d Cir. 2002); *United States v. Montani*, 204 F.3d 761 (7th Cir. 2000); *United States v. Josleyn*, 99 F.3d 1183, 1198 (1st Cir. 1996); *United States v. Winters*, 62 F.3d 1418, 1995 WL 462415 (6th Cir. Aug. 3, 1995) (unpublished); *United States v. Kelly*, No. 17-cr-547001-RWS, 2018 WL 2411593, at *4 (S.D.N.Y. May 29, 2018) (unpublished); *United States v. Hendershot*, 150 F. Supp. 2d 965, 968 (N.D. Ill. 2001). The court is required, however, to use the version of the guidelines in effect at the time of sentencing. USSG § 1B1.11(a). Accordingly, the version the court must apply is the 2018 version. Appendix A in the current Guidelines does not list USSG § 2B4.1 as an offense guideline for 18 U.S.C. § 1341. All but one of the cases cited by the government are analyzing earlier versions of the Guidelines and not the language presently at issue. Material changes since the earliest of these cases include: (1) the November 2000 Amendment to the Sentencing Guideline, which amended USSG § 1B1.2, a clarification "intended to emphasize that the sentencing court must apply the offense guideline referenced in the Statutory Index for the statute of conviction" unless a limited exception applies; (2) the November 2001 Amendment which replaced a former § 2B1.1 with entirely new language and a different listing for 18 U.S.C. § 1341 in the Appendix; and (3) the November 2004 Amendment which amended

The application of § 2B1.1 to this case is straightforward.[14]  The Superseding Indictment charged, and Chris Ponzo pleaded guilty to, conspiracy to commit honest services wire fraud in violation of 18 U.S.C. § 1349 (Count 1), and substantive counts of honest services wire fraud and aiding and abetting honest services wire fraud in violation of 18 U.S.C. §§ 1343 & 1346 (Counts 2-25).  The Statutory Index of the Sentencing Guidelines does not distinguish between honest services mail or wire fraud under § 1346 and "ordinary" mail or wire fraud under § 1341 or § 1343.  (Indeed, this is not surprising, given that § 1346 is not a standalone offense but a definitional section which expands the definition of a "scheme or artifice to defraud" under the mail and wire fraud statutes, § 1341 and § 1343, respectively).  *The Statutory Index does not list § 2B4.1 as an offense guideline section applicable to convictions for wire fraud under 18 U.S.C. § 1343*.  For convictions for wire fraud under § 1343, the Statutory Index refers to guidelines sections §§ 2B1.1 and 2C1.1.  Section 2C1.1 applies to fraud and bribery related to color of official right or public officials, and thus does not apply here in this private sector case.  That leaves § 2B1.1, which covers "fraud and deceit," as the applicable guideline.

The government points to a cross-reference found at § 2B1.1(c)(3), which provides that if "the defendant was convicted under a statute proscribing false, fictitious or fraudulent statements or representations generally (e.g., 18 U.S.C. § 1001, § 1341, § 1342, § 1343); *and . . . the conduct set forth in the count of conviction establishes an offense specifically covered by another*

---

USSG § 2C1.1, and again gave a different listing for 18 U.S.C. § 1341 in the Appendix. The single district court case that post-dates these amendments, *Kelly*, 2018 WL 2411593, at *4, simply asserts that USSG § 2B4.1 applies, without a word of analysis and is of no persuasive value.

*Abbott*, 2019 WL 4394934 at *2 n.1.

[14] Here, the Court must apply the current 2024 version of the guidelines, which, with respect to the applicability of § 2B1.1 to honest services fraud cases, remains materially unchanged from the 2018 version applicable in *Abbott* and the other Varsity Blues cases.

*guideline in Chapter Two* (Offense Conduct), apply that other guideline."  USSG § 2B1.1(c)(3) (emphasis supplied).  As they did unsuccessfully in the Varsity Blues cases, the government argues that under this provision, the Court should apply the "Bribery in Procurement of Bank Loan and Other Commercial Bribery" guideline found at § 2B4.1.  The government is wrong once again.

First, while § 2B4.1 includes the words "commercial bribery" in its section heading, there is no general federal prohibition on commercial bribery.  Rather, as the Statutory Index for § 2B4.1 demonstrates, there are a variety of federal statutes which prohibit bribery and kickback-type offenses in a number of specific contexts not involving public officials, such as: bribes in the procurement of loans from financial institutions (18 U.S.C. § 215); bribes to induce the award of subcontracts on federal projects (41 U.S.C. § 8702); bribes and kickbacks in connection with presidential nominating conventions and election campaigns (26 U.S.C. §§ 9012(e) and 9042(d)); and sports bribery (18 U.S.C. § 224).[15]  As the cross-reference in § 2B.1(c)(3) states, a guideline other than § 2B1.1 may apply to convictions for fraud under the mail and wire fraud statutes only if "*the conduct set forth in the count of conviction establishes an offense specifically covered*" by that other guideline.  Here, the conduct of conviction would *not* establish a violation

---

[15] The full list of offenses from the Statutory Index to which section 2B4.1 applies is: 18 U.S.C. § 152 (bribery in connection with bankruptcy proceedings); 18 U.S.C. § 215 (bank bribery); 18 U.S.C § 220 (kickbacks in connection with rehabilitation facilities); 18 U.S.C. § 224 (bribery in sporting contests); 18 U.S.C. § 225 (continuing financial crimes enterprise); 18 U.S.C. § 1032 (concealment of assets from conservator); 20 U.S.C § 1097(c) (bribery in connection with federal student loans); 26 U.S.C. § 9012(e) (bribery in connection with presidential campaigns); 26 U.S.C. § 9042(d) (bribery in connection with federal elections); 41 U.S.C. § 8702 (bribery in connection with federal contracts); 41 U.S.C. § 8707 (bribery in connection with federal contracts); 42 U.S.C. 1320a-7b (kickbacks in connection with federal health care programs a/k/a the "Anti-Kickback Statute"); 42 U.S.C. § 1395nn(b)(1) (Stark law); 42 U.S.C. § 1395nn(b)(2) (Stark law); 42 U.S.C. § 1396h(b)(1) (state false claims); 42 U.S.C. § 1396h(b)(2) (state false claims); and 49 U.S.C. § 11902 (interference with railroad car supply).

of any of the offenses listed in the Statutory Index as being covered by § 2B4.1, despite arguably being characterized in general terms as a "commercial bribery" offense. *Indeed, the government points to no offense listed in the Statutory Index for § 2B4.1 which they contend is established by the conduct to which Chris Ponzo has pleaded guilty*.[16]  Accordingly, § 2B4.1 simply does not apply.

### b. There Was No Pecuniary Loss Resulting from the Offense, and Therefore Gain Cannot Be Used as an Alternative Measure.

Under USSG § 2B1.1, loss to the victim resulting from the offense may be used to increase the offense level. *See* USSG § 2B1.1(b)(1).  Loss is defined as "the greater of actual loss or intended loss," and "'[a]ctual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* at Notes (A) & (C).  This section further provides that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." *Id.* at Note (B).

Here, as Probation concluded in the PSR based upon its own careful analysis, there was no pecuniary loss to any victim resulting from the offense.  The government's argument that

---

[16] As Probation explained in the Varsity Blues case:

> After the decision in *Skilling v. United States,* 561 U.S. 358 (2010), *every* case of honest services fraud must include a bribe or a kickback. Thus, under the government's theory, the cross-reference section of §2B1.1 would make §2B4.1 the appropriate guidelines for *every* private-sector honest services fraud case with no limiting principle.  In the same way that the Sentencing Commission spoke clearly in the Statutory Index that public-sector honest services fraud cases are governed by §2C1.1, if the Commission intended *every* private-sector honest services fraud case to be governed by §2B4.1 instead of §2B1.1, it is reasonable to expect the Commission would have cited to §2B4.1 in the Statutory Index, rather than expecting the calculator to apply a cross-reference in every single instance.

*See* Probation Office's Submission in Response to Court's Order of September 10, 2019 in *United States v. Huffman*, 19-cr-10117-IT, at ECF No. 440 (emphases in original).

there was a loss from the offense is based almost exclusively on what it contends was "overbilling" by Air Tight (not CAP Electric). But, as explained in detail in section III(e) above, there is no merit to the government's "overbilling" theory, which, as Probation agrees, is flatly contradicted by the actual evidence that Air Tight billed in accordance with established CLEAResult policies, and at standard rates which were agreed to as a matter of contract between CLEAResult and the participating utilities. Moreover, even if the government could prove that there was anything resembling "overbilling" that occurred, the government would still bear the burden of proving that the overbilling resulted in harm which was causally related to the offense of conviction. The government has not even attempted to meet this burden. Under the government's theory of "overbilling," every CLEAResult air sealing contractor, and indeed CLEAResult itself, was guilty of overbilling the utilities. Whether the utilities made a good deal with CLEAResult or not is beside the point.

Because there was no loss, gain cannot be used as an alternative measure, and the offense level is not increased on account of any loss or gain. *See* USSG § 2B1.1(b)(1), Note (B).

### c. Even If Gain Could Be Used – Which It Cannot – the Government Grossly Overstates the Gain Resulting to Chris Ponzo from the Offense.

Even if gain could be used to increase the offense level – which it cannot, because § 2B4.1 does not apply and § 2B1.1 only permits the use of gain where there is a loss but the amount of the loss reasonably cannot be determined – the government grossly overstates the amount of "gain" which resulted to Chris Ponzo from the offense. The government simply assumes, without any evidence or analysis, that every penny of profit (or "net income") which Electrical Associates, CAP Electric, and Air Tight made from CLEAResult between 2014 and 2020 represents gain to Chris Ponzo from the offense. Again, the government simply ignores the actual facts. The evidence is undisputed that Chris Ponzo, through his own hard work, originated

19

and brought to CLEAResult the vast majority of jobs which Electrical Associates, CAP Electric, and Air Tight completed for CLEAResult through the Mass Save program.  It is further undisputed that Chris Ponzo was entitled as a matter of CLEAResult policy to complete all jobs that he originated and brought to CLEAResult.  As the Declarations of Chris Ponzo and expert financial analyst Rebecca Greco (and the attachments thereto) demonstrate, **98.7%** of the revenue which Electrical Associates and CAP Electric earned from CLEAResult, and **95.4%** of the revenue which Air Tight earned from CLEAResult, was derived from customers and jobs which Chris Ponzo originated (or which were assigned to them by CLEAResult employees other than Darlington or Marra).  Applying these percentages to the "net income" numbers that the government puts forth, $16,468,804 of the supposed $16.8 million gain is attributable to contracts *which Chris originated and which he was entitled to work*, or which were assigned to him by CLEAResult employees other than Darlington or Marra (and thus cannot be said to have resulted from the offense).  Accordingly, even if gain were to apply (which it emphatically does not for the reasons explained above), the applicable gain figure is only $331,196, which would only result in an increase of 12 offense levels, not 20 as the government contends.

### d.  The "Sophisticated Means" Enhancement Does Not Apply.

The government is wrong that an enhancement for "sophisticated means" applies under USSG § 2B1.1(b)(10)(c).  As Probation correctly concluded, there was nothing "sophisticated" about this offense.  As noted in the PSR, Application Note 9(B) to USSG § 2B1.1 defines "sophisticated means" as "especially complex or intricate offense conduct pertaining to the execution or concealment of an offense."  The government argues that the sophisticated means enhancement applies because Air Tight was a "shell company" and a "fictitious entity."  It was neither.  Air Tight was registered in the name of Joe Ponzo's wife and was easily traceable to Joe

20

Ponzo, who was the face of Air Tight in all of its dealings with CLEAResult.  Nor is there anything sophisticated about using a check cashing service or making bribe payments in cash. The government has not come close to meeting its burden to show that the "sophisticated means" enhancement applies.

### e.  No Adjustment is Warranted for Mr. Ponzo's Role in the Offense.

The government proposes that the Court apply the 2-level increase under USSG § 3B1.1(c) for an "aggravated role" because, it claims, Chris Ponzo was an "organizer, leader, manager, or supervisor" of three persons who were "participants" in the conspiracy – Darlington, Marra and Chris' brother, Joe Ponzo.[17]  The government asserts that it has proven that Chris Ponzo exercised "control and authority over those participants," as it must, *United States v. Picanso*, 333 F.3d 21, 23 (1st Cir. 2003); *United States v. Grullon*, 996 F.3d 21, 34-35 (1st Cir. 2021), and sums up its argument as follows: "[i]n short, Christopher Ponzo was the leader of the conspiracy who 'exercised authority or control' over other participants, and thus the enhancement should apply."

This however is a wholly distorted characterization of the relationships between Chris and the three other participants.  To be sure, although the bribery and kickbacks constituted honest services fraud, these nevertheless were voluntary business relationships in which there was no command or leader/subordinate structure in which the participants were given orders to obey rather than engaging in mutual cooperation which they saw as beneficial to each other.

---

[17] As framed by the government, there were 4 persons eligible for participant including Chris.  If there were 5, the government would be seeking the enhancement allowed under § 3B1.1 for a 4-level increase (a) or 3 levels (b).  Here the government is seeking the 2-level enhancement (c) that requires only 2 or more participants.  Although Christine Ponzo (Joe's wife) is mentioned in the Superseding Indictment, she is not named in the enhancement request.  And in fact there is no evidence that she was involved as a participant in any actions or decision-making involving bribes or kickbacks.

*United States v. Al-Rikabi*, 606 F.3d 11, 14-16 (1st Cir. 2020) (no enhancement when "[e]ach collaborated when it seemed to his or her advantage to do so, but nothing about this collaboration shows that one managed, directed, or supervised the other"). Arranging a schedule or a place for a transaction, does not constitute leadership or management. *See id.* Nor is the "management of criminal activities (as opposed to the management of criminal actors)" a basis to conclude that a person is a leader. *United States v. Ramos-Paulino*, 488 F.3d 459, 464 (1st Cir. 2007); *United States v. Goncalves*, 2024 WL 5134965 at *13 (1st Cir. 2024).

In this case, Chris Ponzo had separate and independent relationships with each participant with a result that was not "more than shared criminal activity." *United States v. Picanso*, 333 F.3d at 21, 24; *United States v. Fuller*, 897 F.2d 1217, 1220-21 (1st Cir. 1990). Neither Darlington nor Marra were commanded by Chris Ponzo to produce customers. Chris obtained the customers himself. He then used money and gifts as a means to incentivize and motivate the two project managers to perform the very work they were assigned to do by their employer – to visit and assess potential properties and process applications for Mass Save grants through the CLEAResult bureaucracy – and to do so vigorously, constantly and ever more extensively – in order to increase the revenue and customer base of both of the Ponzos' companies and CLEAResult itself. And, unlike the superior/subordinate relationships typically found where an aggravating role is warranted, the participants here were not asked to do anything that was per se or inherently illegal – only their jobs. This is not a drug conspiracy.

As for Chris' relationship with Joe Ponzo, it was obviously a mutually cooperative affair in which Chris invited his brother to take the advantage of a highly remunerative business proposition. This was in no way a role calling for an enhancement.

22

#### f.  No Adjustment is Warranted for Obstruction of Justice.

The government asserts that Mr. Ponzo should receive a 2-point increase for obstructive conduct under USSG § 3C1.1 because he has pleaded guilty to violating 18 U.S.C. §1001 by falsely stating in an interview with law enforcement agents:

> that he had never given any cash, gifts, or anything of value to any [CLEAResult] employee, including [Darlington] and [Marra], adding in sum and substance, "We don't do that."

Superseding Indictment, Count 31.

Mr. Ponzo and Probation both contend that § 3C1.1 does not apply because Application Note 5(B) provides that "making statements, not under oath to law enforcement officers" does not warrant an enhancement "unless Application Note 4 (G) above applies[,]" that is, unless the false statement "significantly obstructed or impeded the official investigation or prosecution of the instant offense."  The latter has not been shown by the government to be true.

The government responds with a twofold argument:

First, it points to another paragraph in Note 4 which states that the adjustment applies "*to any other obstructive conduct* . . . where there is a separate count of conviction for such conduct," and another comment in Note 5 which states that "if the defendant is convicted of a separate count for such conduct, this adjustment will apply to and increase the offense level for the underlying offense."  It then interprets the language "*other obstructive conduct*" and "*such conduct*" to mean that a § 1001 conviction for false statements automatically constitutes a conviction for "obstructive conduct."  (emphasis supplied).  Therefore, the government argues, that given that Mr. Ponzo was separately convicted under § 1001, the enhancement applies for that reason alone.  It argues that there need not be any evidence that defendant "significantly obstructed or impeded the official investigation or prosecution."

23

Secondly, the government argues that that even its interpretation is not correct, Note 4(G) is satisfied because the false statement did in fact "significantly obstruct[] or impede[]."

Both of these claims are clearly wrong.

In the first place, the government makes a fundamental mistake in its interpretation of the guideline that a § 1001 false statement automatically and necessarily constitutes "obstructive conduct." Not so. To be sure, some false statements are precisely that – and the guideline in Notes 4(G) and 5(G) makes provision for statements that are shown to have actually caused obstruction. Indeed, the USSG Statutory Index does not refer a § 1001 sentencing issue to §3C1.1 at all. Instead, it refers to § 2B1.1, the general guideline for "Offenses of Fraud or Deceit."

Another and equally fundamental flaw in the government's contention is its complete failure to recognize the overall "Limitation on Applicability of Adjustment" in § 3C1.1, Note 2, which states that a defendant's "refusal to admit guilt . . . is not a basis for application of this provision." A false denial of guilt is exactly what Count 31 in this case alleged. Although the false statement set forth in that Count can and has served as the basis for a § 1001 conviction, *see Brogan v. United States*, 522 U.S. 398 (1998) ("exculpatory no" not a defense to a § 1001 prosecution), the guideline specifically excludes this as a ground for an enhancement under §3C1.1 – whether or not an obstructive effect has been proved.

In any event, the evidence here is very clear – and cogently summed up in Probation's response to the government's objection. PSR pp. 51-52. We agree with that discussion and need not repeat it here.

24

**g. With No Adjustment for His Role in the Offense, Mr. Ponzo Is Entitled to a Two-Point Reduction on Account of His Zero-Point Offender Status.**

The government concedes that if the organizer enhancement under USSG § 3B1.1(c) does not apply – which it does not for the reasons stated above – then Chris is entitled to a two-point reduction under USSG § 4C1.1 on account of his zero-point offender status.

***

In light of the foregoing, the correct guidelines calculation produces a total offense level of **3**. Given that Chris' criminal history category is I, this offense level falls in Zone A of the Sentencing Table, with a recommended guidelines range of 0 to 6 months.

**V.      The Court Should Impose a Sentence of Probation with Substantial Community Service.**

Chris Ponzo respectfully requests that he be sentenced to a one-year term of probation, with significant community service as a special condition of probation. That sentence represents "just punishment" for his crime, taking into account "the nature and circumstances of the offense" and Chris' "history and character." 18 U.S.C. § 3553(a). It is "sufficient, but not greater than necessary" to "reflect the seriousness of the offense [and] to promote respect for the law." *Id.* Under the circumstances, it "afford[s] adequate deterrence to criminal conduct" and would "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.*

**a. The Proposed Sentence is Permissible Under the Guidelines.**

A sentence of probation and community service falls squarely within the applicable guidelines range of 0-6 months. The guidelines specifically authorize the Court to impose a sentence of probation for a defendant like Chris Ponzo who is a first-time offender and whose guideline range falls within Zone A. USSG §§ 5B1.1; 5C1.1; *see* PSR ¶¶ 127-128. Even if the

Court were to calculate a guideline range falling in Zone B, a probationary sentence would nonetheless be authorized by the guidelines. USSG §§ 5B1.1(a)(2); § 5C1.1(c)(3) and Note 10; PSR ¶ 128.

#### b. The Proposed Sentence is Consistent with Other Sentences Imposed in this District and Nationally for Similar Offenses and Thus Avoids Unwarranted Disparities.

A sentence of probation would be consistent with other sentences imposed on other defendants with similar records convicted of similar offenses, and thus would "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Even after the Supreme Court made clear that the sentencing guidelines are advisory, not mandatory, "it is unquestioned that uniformity remains an important goal of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 107 (2007). Probation attached to the PSR data from the Judiciary Sentencing Information (JSIN) database for defendants sentenced nationwide under USSG § 2B1.1 who had a total offense level of 3 and a criminal history category of I, excluding defendants who received a substantial assistance departure under USSG §5K1.1. PSR ¶ 146 and p. 33. According to JSIN, only 6 such defendants nationwide were sentenced in the last four fiscal years, making for a very small sample size. *Id.* In order to increase the sample size, undersigned counsel increased the total offense level to 4, which produced a much larger sample size of 1453 defendants. Of those 1453 defendants sentenced under § 2B1.1 with a criminal history category of I and a total offense level of 4 (i.e., one point *higher* than Chris' total offense level), close to half (42%) were sentenced to

a term of probation.[18]  *See* Ex. 61.  The median sentence imposed was 0 months (i.e., a probationary sentence).  *See id.*[19]

Defendants with similar profiles sentenced in the District of Massachusetts are even more likely to receive a sentence of probation.  A statistical analysis prepared for one of the Varsity Blues cases analyzing sentences in this District between 2002 and 2018 of defendants who pleaded guilty to charges governed by USSG § 2B1.1 with a guideline range of 0-6 months and a criminal history category of I, revealed that only 5 of the 127 such defendants (or 3.9%) were sentenced to a term of imprisonment (beyond "time served").  *See* Ex. 62 (originally filed in *United States v. Huffman*, 19-cr-10117-IT, ECF No. 425-4).  In light of this data, a sentence of probation in this case would be fully consistent with other sentences imposed on similar defendants for similar offenses, while a sentence of incarceration would create an unwarranted disparity.

### c.    A Sentence of Probation and Community Service Would Constitute "Just Punishment."

Chris Ponzo committed a federal crime, which he admitted to when he pleaded guilty in this case.  He does not here seek to justify or excuse that conduct.  Still, because this Court must take into account the "nature and the circumstances of the offense" in deciding upon an appropriate sentence, Chris seeks to place his conduct into the proper context by highlighting several indisputable facts about the nature of his offense.

First, Chris was a legitimate, professional contractor who did good work and developed, on his own merit, a large book of highly satisfied customers who gave him repeat business.

---

[18] Excluding defendants who received a substantial assistance departure under USSG §5K1.1.

[19] For the 846 such defendants who were sentenced to a term of imprisonment, the median term was 4 months.  *See* Ex. 61.

Second, this is not a money for contracts case.  Chris Ponzo generated the vast majority of jobs which he brought to CLEAResult and he was entitled as a matter of CLEAResult policy to perform those jobs.  He gave cash and gifts to Eric Darlington and Peter Marra not in exchange for contracts, but to motivate them to go the extra mile to perform the energy audits and process the necessary paperwork in order to allow Chris to perform the jobs in a timely manner and keep his customers happy.  This was to everyone's benefit, including Chris, his customers, CLEAResult, and even the utilities, who needed to meet their annual savings goals.  He also acted out of a notion of fundamental fairness:  he was doing well, so Darlington and Marra should do well too.

Third, while CLEAResult (the only proper victim in this honest services fraud case) was deprived of the honest services of its employees, Eric Darlington and Peter Marra, Chris actually provided an economic gain to CLEAResult.  CLEAResult was, at base, a sales organization which was constantly pushing its workforce to hit quarterly and annual targets.  National Grid paid CLEAResult a 15% commission on every Mass Save job it oversaw; Eversource paid a monthly management fee equal to approximately the same margin; and both utilities paid per-unit audit fees of $60 to $70.  The more jobs Chris Ponzo brought to CLEAResult, the more money CLEAResult made.  Chris Ponzo was one of CLEAResult's most productive Mass Save contractors, and there is no disputing that he made CLEAResult a lot of money.

Fourth, the Mass Save program is not on trial here.  The Mass Save program has received much negative publicity lately, and the government evidently believes that the program is not serving the interests of Massachusetts energy consumers in the way that the government believes it should.  There is room for debate on whether reform is needed, but Chris Ponzo should not be held criminally responsible for inefficiencies or structural defects in the Mass Save program.

There is no question that, as it was structured during all times relevant to this case, the Mass Save program was very lucrative to participating contractors. The economic terms of the program are a matter of contract which are negotiated between the participating utilities and lead vendors like CLEAResult. Beyond the payments to Darlington and Marra, for which he has pleaded guilty and accepted responsibility, Chris Ponzo played within the rules as they existed. If the utilities believe they could achieve their energy savings goals more cheaply or efficiently, or otherwise better serve Massachusetts energy consumers, through a different program structure (such as one which eliminated intermediaries like CLEAResult), then they should implement reforms to the program.

It bears repeating that none of this is offered to excuse Chris' conduct. He paid Darlington and Marra to compensate them for services that fell within the scope of their employment with CLEAResult; in doing so he divided their loyalties; and for that, he has pleaded guilty to honest services fraud. His conduct is deserving of punishment. But that punishment should be based on the actual facts of this case, and not the unsubstantiated and in many instances demonstrably false narrative which the government seeks to advance.

### d. A Sentence of Probation and Community Service Would Provide Adequate Deterrence and Promote Respect for the Law.

18 U.S.C. § 3553(a)(2)(B) requires the Court to consider whether the sentence imposed will "afford adequate deterrence to criminal conduct" and "promote respect for the law." The sentence Chris Ponzo proposes would accomplish both these goals. A federal felony conviction resulting in a term of probation and a condition requiring significant community service, constitutes substantial punishment, particularly where a non-custodial sentence is by far the most typical sentence imposed in similar circumstances. The Supreme Court recognized in *Gall v.*

*United States*, 552 U.S. 38, 48-49 (2007), that probation "is not an act of leniency" but a "substantial restriction of freedom."  As the Supreme Court observed:

> [Although] custodial sentences are qualitatively more severe than probationary sentences of equivalent terms[,] offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'"(quoting *Griffin v. Wisconsin*, 483 U. S. 868, 874 (1987))).  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual 'special conditions' imposed by the court.

*Id.*  Implicit in the Supreme Court's observation is that sentences of probation do have a general deterrence effect and do promote respect for the law even though they do not carry with them the most severe form of restriction on liberty that custodial sentences do.  Particularly where, as here, a probationary sentence is fully consistent with the applicable guidelines range, the Court should not hesitate to impose a probationary sentence out of concern that it will not fulfill these goals of sentencing.

### e. Consideration of Mr. Ponzo's History and Characteristics Justifies a Probationary Sentence.

The over 100 letters submitted with this memorandum, collected at Ex. 1, provide an indelible portrait of a remarkable man, underscoring the truly aberrational nature of the conduct for which Chris Ponzo is now facing punishment.  These letters, sent by friends, family, co-workers, employees, members of the St. Joseph's School community, St. Patrick's Church

community, fire fighters [20], veterans[21], members of law enforcement[22] are consistent and effusive in their praise of Chris as a hardworking, humble, selfless and dedicated father [23], godfather [24], role model [25], volunteer [26], community member and mentor [27], who always puts others ahead of himself. They are written by people from all walks of life – including current and former employees at Home Depot [28], pastors[29], owners of local cafes [30], lawyers [31], as well as leadership

---

[20] Letter of James Marshall, Captain on Stoneham, MA Fire Department (CP-089); Letter of Michael Labriola Jr., firefighter for Stoneham Fire Department for over 22 years and recently promoted to rank of Captain in Fire Prevention (CP-091); Letter of Kevin Wesley (CP-102); Letter of Keith McInnis (CP-019).

[21] Letter of Michel Labriola, Jr. (CP-091); Letter of Keith McInnis (CP-019).

[22] Letter of Massachusetts State Police Lt. Colonel (Ret) Daniel Risteen Jr. (CP-011).

[23] Letter of Robert Henry Minton, Jr. (CP-106); Letter of Caitlin Flores (CP-109); Letter of Matt Duhamel (CP-110); and many others.

[24] Letter of Paul Stephen Arsenault (CP-023); Letter of Robert Constantine (CP-031); Letter of the Melino's (CP-069).

[25] Letter of the Maione's, CP-078; Letter of Candace Voelker (CP-098); Letter of Samantha Oliphant (CP-104).

[26] Letter of Phil Alviti (CP-100); Letter of Samantha Oliphant (CP-104); Letter of Robert Henry Minton, Jr. (CP-106); and many others.

[27] Letter of Parker Rogers (CP-087); Letter of Paulo Correa (CP-045); Letter of Lawrence Bruno (CP-056).

[28] Letter of Robin Anderson (CP-136); Letter of Joe Shannon (CP-138); Letter of Matt Walker (CP-120).

[29] Letter of Fr. Ron Barker, Maureen Miller, Merry Nordeen and Karen Morgan of St. Joseph (CP-006).

[30] Letter of Justina Langone (CP-059).

[31] Letter of Michael Casoli (CP-026); Letter of Mario Patalano (CP-002).

of large companies [32], and paint a picture of a person who would literally take the "shirt off of his back" [33] for anyone in need, without expecting or accepting recognition in return.

Nearly every single letter mentions Chris' generosity, spirit, dedication to his wife, his three children, the Stoneham Community and the St. Joseph's School Community [34]. In describing Mr. Ponzo, Christine Ponzo wrote, "To say he is a generous man is an understatement…I have seen it more often than not, where we would go out for dinner and Chris would see a veteran, he would call our waitress over and would give her money and tell her that he wanted to pick up the Veterans tab, but don't tell him who did it." [35]

As Renee Arsenault notes, "Chris is the kind of father who is always attentive, patient, and consistently present for his three sons. Every moment of his life is dedicated to his family, and anyone who knows him can attest to that.  He is the type of parent, husband, and son every family hopes to have." [36] Similarly, Michael and Michelle Maione note, "I could write paragraphs highlighting all of the ways he's affected the lives of those around him, but the

---

[32] Letter of Timothy Haggerty, Owner of lighting manufacturing and distribution company Brightluxe (CP-085); Letter of Paul Stephen Arsenault, Global Head of Talent Acquisition for a technology based company Plume in Silicon Valley (CP-022); Letter of Adam Arsenault, Director of Operations for New England Construction (CP-030).

[33] Letter of Renee Dorney (CP-134); Letter of Kathryn Butler (CP-063); Letter of Michael Labriola (CP-091).

[34] Letter of Joy Bethune (CP-028); Letter of Robert J. DeFrancesco (CP-018); Letter of Michael Casoli (CP-026).

[35] Letter of Christine Ponzo (CP-141).

[36] Letter of Renee Danielle Arsenault (CP-055).

biggest reflection of his character is his three wonderful children. They are kind, thoughtful, honest, brave little boys, and the best role models for my own children." [37]

As countless letters describe, for nearly twenty five years at Christmas, Chris has driven a trailer around the neighborhood that he turned into "Santa's Sleigh" to blast Christmas music and help hand out toys and gifts to children of families in need. [38] As Scott Greenleaf notes about the impact of this event "As a firefighter for the Town of Stoneham for almost thirty years, I know firsthand just how amazing this event is and what it means to many of the families that are lucky enough to receive these wonderful gifts."[39]

Chris has also dedicated hundreds if not thousands of hours to the St. Joseph's School Community. [40] Kelly Williams writes that Chris is "the reason our Saint Joseph School community has become a special place for all 242 students. All the students know him as 'Mr. Ponzo.' He continually gives his time and talents to bring joy to all of them, asking for nothing in return. For example, year after year Chris gives hours to creating an annual Halloween Haunted Stroll and Christmas Stroll [41]…These two events alone have provided our families with core memories and countless smiles... Chris dedicates months to building theater sets for school

---

[37] Letter of Michael and Michelle Maione (CP-078).

[38] Letter of Janeen Silvestri (CP-131); Letter of René Ferrazzani (CP-066); Letter of Samatha and Jonathan Oliphant (CP-104); Letter of Mario Patalano (CP-002); Letter of Michael and Michelle Maione (CP-078); Letter of William and Michelle Perry (CP-135); and many others.

[39] Letter of Scott and Melissa Greenleaf (CP-072).

[40] Letter of Samantha and Jonathan Oliphant (CP-104); Letter of Candace Voelker (CP-098); Letter of Christine Manley (CP-116); Letter of Kelly Williams (CP-075); and many others.

[41] Jonathan and Samantha Oliphant also describe how Mr. Ponzo has spent hundreds of hours building and supplying props for the school's annual plays, ensuring each performance is memorable for the students, and how every year, Chris provides and sets up over 40 inflatable decorations these Halloween and Christmas "stroll" events. (CP-104).

productions. Late night and creative challenges never phase Mr. Ponzo. He will figure it out for all of the children." [42]

Chris' kindness, compassion and generosity are especially apparent during times of crisis and tragedy. The letters describe in depth how Mr. Ponzo, without hesitation, will show up in support, no matter the time of day or night. There are far too many examples to list them here. As Robert and Alexandra Melino state, "To cite specific examples of Chris' selfless nature would be impossible. There are simply too many to count, from showing up at 10pm to help diagnose a septic system problem, to installing a new water heater with no question, to the person we call when we need to take one of our children to the ER and someone needs to be home with the others, there is one common theme, he always shows up." [43]

Similarly, when Roy and Ann Mallane woke up to water in their basement because their water heater had failed, Chris first offered advice over the phone but then called back and said he would be there in 20 minutes. The Mallanes' wrote, "He changed his plans for the day and arrived with his tools and the trailer attached to his jeep. We went over to Home Depot, we purchased a brand new water heater, we brought it back to the house and within two hours everything was up and running with minimal damage and at the cost of just a friend helping a friend in his time of need." [44]

When Anthony Silvestri was involved in a catastrophic snowmobile accident that led to a lengthy hospital stay and another long stay in rehab, Chris "stepped in without being asked and helped their sister and my children get through a traumatic time. Even when many friends and

---

[42] Letter of Kelly Williams (CP-075).

[43] Letter of Robert and Alexandra Melino (CP-069).

[44] Letter of Roy and Ann Mallane (CP-123).

family have faded out after my injuries, they were true constants in our lives….I rely on them for things I am unable to do for my family now. This help has included doing multiple projects around my home to make it handicap accessible for me, shoveling, plowing, yard work, transportation when needed, and moral support that is beyond words. Even when dealing with their own problems, they still find the time and sympathy to reach out to me daily and check on me." [45]

Similarly, when Greg Lapery suffered a heart attack, "Chris was one of the first people to reach out. His immediate response was to offer his support in any way possible. He made it clear that he was willing to assist me with anything at my home and even offered financial help, knowing I had children in college. This was an unexpected and deeply generous gesture."[46]

Christine Chiodini described a similar act of kindness as she wrote, "My husband had a knee replacement this year and we have a stairlift used previously for my mother in law which wasn't working. No stairlift company would send out a repairman and we were left with no other option than to replace the entire stairlift. I asked Chris if he could send someone to look at the problem. He did and that man spent approximately 5 hours figuring out what was wrong and fixing it. As expected, Chris wouldn't take any money for fixing the stairlift." [47]

As the Langone Family notes in their letter, "On May 31, 2018, at 3:30 AM we had a 3 Alarm Fire at our family home, thankfully everyone was safe. We had lost our family home and had become displaced given the severe damage from the fire and water. The story hit the news that morning and Chris had reached out to us immediately. Chris expressed his sympathy for the

---

[45] Letter of Anthony Silvestri (CP-088).

[46] Letter of Greg Lapery (CP-139).

[47] Letter of Christianne Chiodini (CP-064).

tragedy our family had gone through and opened up his home to us as we needed a place to stay…Chris also helped my family out with the process of rebuilding our home, helping with finding good reliable contractors, and guided us through the process with the insurance company, as we did not have much experience in either process." [48]

As the outpouring of support for Chris demonstrates, he is fundamentally a good person who regularly engages in selfless acts, with no expectation of receiving anything in return, in order to help people in need of help and to better his community.  The conduct for which he has pleaded guilty is not at all representative of who he is as a person, and given his usually strong moral compass, the Court need not be concerned that he will reoffend if given a probationary rather than a custodial sentence.

## VI.    Conclusion

For all the reasons set forth above, Mr. Ponzo respectfully requests that the Court sentence him to one year of probation, with significant community service as a special condition of probation.  Such a sentence is "sufficient, but not greater than necessary" to serve the purposes of sentencing as articulated by 18 U.S.C. § 3553(a).

---

[48] Letter of Langone Family (CP-004).

Respectfully submitted,

CHRISTOPHER PONZO,

By his attorneys,

*/s/ Max D. Stern*
Max D. Stern, BBO # 479560
Howard M. Cooper, BBO # 543842
Christian Kiely, BBO # 684308
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
mdstern@toddweld.com
hcooper@toddweld.com
ckiely@toddweld.com
617-720-2626

Dated:  January 31, 2025

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Christian G. Kiely*
Christian G. Kiely

Dated:  January 31, 2025