UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff        )
                                     )  No. 1:22-cr-10094-NMG-2
vs.                                  )
                                     )
CHRISTOPHER PONZO,                   )
                                     )
                    Defendant.       )
                                     )
                                     )
                                     )


BEFORE THE HONORABLE NATHANIEL M. GORTON
UNITED STATES DISTRICT JUDGE
Sentencing




John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, Massachusetts 02210


February 5, 2025
3:23 p.m.



Kristin M. Kelley, RPR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, Massachusetts 02210
E-mail: kmob929@gmail.com

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:


          Lauren Maynard
          Dustin Chao
          United States Attorney's Office MA
          1 Courthouse Way
          Suite 9200
          Boston, MA 02210
          617-748-3227
          lauren.maynard@usdoj.gov
          dustin.chao@usdoj.gov
          for Plaintiff.



          Christian G. Kiely
          Howard M. Cooper
          Max D. Stern
          Todd & Weld
          One Federal Street
          27th Floor
          Boston, MA 02110
          617-624-4729
          ckiely@toddweld.com
          hcooper@toddweld.com
          mdstern@toddweld.com
          for Christopher Ponzo.

                        P R O C E E D I N G S

THE CLERK:  All rise.

(The Honorable Court entered.)

THE CLERK:  Thank you.  You may be seated.

This is Criminal Action No. 22-10094, United States of America versus Christopher Ponzo.

Would counsel please introduce themselves for the record.

MS. MAYNARD:  Good afternoon, your Honor.  Lauren Maynard for the United States.

THE COURT:  Miss Maynard, good afternoon.

MR. CHAO:  Good afternoon, Dustin Chao for the United States.

THE COURT:  Mr. Chao.

MR. KIELY:  Good afternoon, your Honor.  Christian Kiely for Mr. Christopher Ponzo.

THE COURT:  Mr. Kiely.

MR. STERN:  Max Stern for Mr. Ponzo.

THE COURT:  Mr. Stern.

MR. COOPER:  And Howard Cooper for Mr. Ponzo.

THE COURT:  Mr. Cooper and Mr. Ponzo.

We have Miss Victoria from Probation.  Good afternoon to her.

PROBATION:  Good afternoon, your Honor.

THE COURT:  We are here on the sentencing of

Christopher Ponzo.  I have received and considered the presentence report, the government's Sentencing Memorandum, to which was attached approximately 300 pages of evidentiary material, the defendant's Sentencing Memorandum, to which was attached as Exhibit 1 121 letters in support and multiple exhibits of an evidentiary nature, approximately 400 pages worth.

With respect to the letters in support, there were multiple letters from members of the family, friends, co-workers, teachers, military personnel, first responders, neighbors, church community and others.

Then I've also received most recently a notice of a victim impact statement, a motion to strike the late filed victim impact statement, to which several exhibits were attached, and a motion for leave to file defendant's response to footnote 4 of the government's sentencing memorandum.

Those are all the writings I've received.  Is there anything I didn't mention that I should have received? Miss Maynard?

MS. MAYNARD:  No, your Honor.

THE COURT:  Mr. Kiely?

MR. KIELY:  Your Honor, we did submit a declaration for Mr. Ponzo and an expert declaration from Becca Greco that were separate docket entries following our Sentencing Memorandum.

THE COURT: Well, you can refer to those. I am unaware of them. If it becomes necessary during the course of these proceedings, you may refer to them and cite them to me.

MR. KIELY: Okay. Thank you. They are cited in our memorandum.

THE COURT: Okay. Fair enough.

Before we start, I want to give you a sense of my strong inclination so you can tailor your arguments accordingly. There are several issues here to resolve and I do not want us to spend time on issues I have already decided.

First, I will accept the recommendation of the Probation Office that the applicable guideline for this offense is Section 2B1.1 as an offense of fraud and deceit, not Section 2B4.1, which instead applies to offenses of commercial bribery and kickbacks. Appendix A does not reference Section 2B4.1 as an applicable guideline for fraud convictions under Sections 1341 and 1343.

Second, I also will accept the recommendation of the Probation Office that there is no calculable loss amount and, therefore, the defendant's prodigious gain in this case cannot be used as a substitute in place of loss.

I instead want to focus the parties' arguments on the applicability of the enhancements, that is sophisticated means, role in the offense, and obstruction of justice. I am strongly inclined to sustain the government's objections on each of the

upward adjustments at issue here, but I will hear counsel in regard to these.

I also want the parties to discuss the degree to which a departure or variance is warranted.

As a final note, I am going to deny the defendant's motion to strike the victim impact statement by CLEAResult. However, I have considered the defendant's arguments and will treat the motion to strike as, essentially, a memorandum in opposition to the victim impact statement.

With that, I'm going to turn to the presentence report objections, which are probably the longest set of objections I've seen.  They occupy 15 pages, single spaced, and consists of roughly ten objections.

Objection No. 1 by the government is with respect to the applicable guideline about which I have just announced my decision, but I will hear the government if they wish to be heard in that regard.

MS. MAYNARD:  Your Honor, I won't spend a ton of time on it since you've already let us know how you feel about it, but the government does maintain that Section 2B4.1 should apply, and this is because Section 1346 does not expressly appear in the statutory index.  For that reason, the guideline Section 2X5.1 says that if an offense is a felony for which a guideline is not expressly promulgated, then the Court should apply the most analogous offense.

In this case, we're talking about a bribery scheme. This is a standard commercial bribery offense. Yes, it was charged as honest services fraud, but the crux of the scheme is bribery, and that's where the commercial bribery guideline best fits this offense.

The government would maintain that this is not like the "Varsity Blues" case, if those cases were fraud schemes. That's really what it came down to. And, in those cases, Section 2B1.1 was more appropriate because that's the fraud guideline and it was fraudulent conduct that the Court was looking at. Here, by contrast, again, we have a for profit company. We have employees of that company being bribed in exchange for commercial contracts.

Other courts have applied this guideline. You can look on page 15 of the government's Sentencing Memorandum where we cite those other cases, but, in short, it's fact that this is, at its core, the classic bribery commercial scheme. For that reason, we do believe that Section 2B4.1 should apply.

THE COURT: Thank you, Miss Maynard.

Does the defendant wish to be heard in this regard?

MR. KIELY: Your Honor, we would rest on the argument we've made on our papers given your preparatory comments.

THE COURT: All right. The Court accepts the Probation Office's reasoning and, therefore, objection No. 1 is overruled.

Objection No. 2 is with respect to victim impact, which I've also expressed my decision on, but I will hear the government if it wishes to be heard.

MS. MAYNARD: Yes, your Honor. Again, I will keep it short. I think it's important here because this is a complicated set of facts: The way that CLEAResult paid its contractors; the way that this money came from utilities to CLEAResult to the contractors; and, most importantly, the way that contracting worked. I think it can be a little bit complicated. So it's important to know exactly how this worked.

Now, in these cases, a contractor could refer a contract in to CLEAResult but then it was up to those employees to actually, first of all, approve the contract, approve the project to be done at all and then, once it's approved, they put together the contract based on certain factors, like the square footage of a building or whether or not there was an attic.

These are the things that could be manipulated and these are the things that Eric Darlington and Peter Marra did manipulate, and they did that in exchange for bribes. When they did those manipulations, they could mess with things. Yes, hourly rates were set. They sometimes adjusted those, but for the most part that was set. And yes, there were guidelines for things, like if a building has this many square feet, then

it should take this many hours to complete, but what they were doing is they were fudging these numbers.

So Peter Marra, he might go out to a property.  Maybe this property had 200 units but only 100 units had attics. What he would do is he would write a contract as if all 200 units have attics, and that grossly overestimated the number of hours that were required, and we have examples of this.

If you look at the Pine Hills inspection report, for example, and that's Exhibit 20, the number of attics for that job that was contracted by Peter Marra was off by a factor of two.  Now, your Honor, that's just one example.

There are others.  There's Wellington.  That's at Exhibit 22.  The pictures show where, you know, the job was not done well.  We have examples of this.  We don't have it for every job because it doesn't exist.  Inspections weren't done for every single job but we have examples and we know that these numbers could be manipulated, and they were manipulated, and that resulted in the utilities paying for work that simply wasn't done.  That means they paid a contractor more than they deserved and it means that the energy savings that these funds were meant to pay for were never realized because the work was not done.

Your Honor, the government maintains that that's a real loss.  It's a loss to CLEAResult.  It's a loss to the

utilities and, frankly, it's a loss to every rate payer in Massachusetts who was funding these projects.

THE COURT:  All right.

Does the defendant wish to be heard?

MR. KIELY:  Yes, your Honor.

Probation correctly determined here, based on a careful review of the evidence, that there was no pecuniary loss to any victim.  Miss Maynard pointed to an example of the Pine Hills property where there was some discrepancies in the building and she says that's just an example, but really it's the only example that the government has.  She pointed to one other job, Wellington, where she said, quote, the job was not done well.  I'm not sure exactly what that means.

The testimony and the unrebutted evidence from the grand jury and the unrebutted evidence in the record is that these prices were set by contract.  The lighting fixtures were X dollars per contract.  The air sealing was X dollars per square foot or per hour, established as a matter of contract between the utilities and CLEAResult.  There was very little room to manipulate that, and there's no evidence that there was any kind of manipulation, much less that any stray discrepancies that might exist in the record were a byproduct of this alleged criminal conspiracy.

The four hours per unit was a standard rate for air sealings set by CLEAResult bosses, not by any of the insiders

who were part of this conspiracy.  8 hours per attic, $84 per hour, that's Exhibits 56, 57 and 58.

Very importantly, it was CLEAResult's policy that CLEAResult would pay the quoted number of hours per each job regardless of the actual time it took.

Mr. Cote, who authored CLEAResult's late filed victim impact statement, testified unequivocally in the grand jury, there are winners and losers sometime.  We pay the quoted amount regardless of the actual time it took.  Here, whether the utilities made a better deal or might have made a better deal with CLEAResult is irrelevant to whether there was a clear loss.

Also, the government has argued that there was overbilling and, thus, loss to CLEAResult and the utilities based upon the spread that Air Tight was paid by CLEAResult versus what it was paying to its subcontractor labor to do the work.  Again, we've laid that out in our Sentencing Memorandum. I didn't hear Miss Maynard address that, so I won't respond to that unless your Honor wants me to.

THE COURT:  No.  That will do.

With respect to the objection No. 2, the Court accepts the Probation Officer's reasoning and, therefore, the objection is overruled.

Objection No. 3 is with respect to the loss calculation, which is very similar to the argument that we just

heard, but if the government wishes to be heard on that, I will hear them now.

MS. MAYNARD:  Your Honor, again, this is basically what we just talked about so I won't add much.  I will just say, again, these guidelines were set 4 hours per attic, 6 hours per attic, that kind of thing, based on the presumption that the CLEAResult employees going out to look at these jobs were scoping them accurately, and that simply is not what was happening.  We know this.  We have clear examples of this.

Peter Marra in the Pinehills example, and I use that because it's the most clear example, he overstated the number of attics two-fold.  He overstated the number of hours required for that job by over a thousand.  That's significant.  And I do think that the discrepancy in the invoices between what Air Tights submitted and between what Chinasa, the subcontractor, submitted to Air Tight, that is significant because it just goes to show how much they were inflating these contracts.  The difference was over 80,000 hours.  That's not an hour or two here or there to make a profit.  That's evidence of fraud.

THE COURT:  Thank you, Miss Maynard.

Mr. Kiely, do you wish to be heard?

MR. KIELY:  Your Honor, I really have nothing to add to that beyond the fact that I would just underscore that what Air Tight was paying its subcontracted, whether it was subcontracted labor or employee labor, they were entitled to

make a profit.  The $84 an hour, that was set by contract.  If they go out and pay minimum wage, as long as they're not violating labor laws and not violating the law, that's their prerogative.  They were entitled to earn a profit on that. Just because they were paying less does not mean that they were somehow overcharging CLEAResult, and that's particularly so where the rates that they were charging and the specs were set as a matter of both contract and policy.

THE COURT:  All right.  The Court again accepts the Probation Office's reasoning and, therefore, objection No. 3 is overruled.

Turning to objection No. 4, that is with respect to the enhancement for sophisticated means.  As the Court has also indicated, it is strongly inclined to accept the government's position in that regard.

Do you wish to be heard in response to that, Mr. Kiely?

MR. KIELY:  Yes, your Honor.

Your Honor, we agreed with Probation that there is nothing sophisticated about this offense.  Under Section 2B1.1(b)(10)(C), the government has the burden of proving that the fraud was especially complex or intricate in order to be entitled to an adjustment based on sophisticated means.  It has not met that burden there.

It relies principally on the argument that Air Tight

was a shell company.  It was not, as Probation concluded, it was not designed to hide anything.  It was an LLC that was set up for the purposes of contracting with CLEAResult, which was openly connected to Joe Ponzo and his wife.  His wife's name was on the documents of the corporation filed with the Secretary of State.  A shell corporation is a corporation which is set up to conceal where money is going or coming from.  Air Tight did not do that.  It was not somehow being used to disguise payments of any kind.

In addition, the government points to the fact that Mr. Christopher Ponzo was cashing checks and using some of the proceeds of that to make bribe payments.  We submit that this is the opposite of sophistication, making bribe payments in cash.

Finally, in its sentencing memorandum, the government points to a couple of exhibits where Air Tight's subcontractors, Larry Fernandez and Maria Csuri, were setting up email addresses that were at AirTight.com.  There's nothing nefarious or improper about people who do work for Air Tight having and using Air Tight email addresses.  It's absolutely commonplace for independent contractors to have email addresses at companies they regularly do work for, even if they're not W-2 employees.  Realtors do this, insurance brokers, sales people, bookkeepers.  There's nothing nefarious about it whatsoever.

Finally, the government points to Exhibit 33, which was just an effort between Mr. Joseph Ponzo and his accountant to establish a salary for Christine Ponzo.  In fact, the government turns this document on its head.  What they were trying to do was set the salary not at an inflated amount but at the lowest amount possible that would be acceptable to the IRS in light of her role with Air Tight.

So we would submit that there's nothing sophisticated about this offense that would warrant an adjustment based on sophisticated means.

THE COURT:  All right.  Thank you.

Miss Maynard, do you wish to be heard?

MS. MAYNARD:  Yes, your Honor.

The company Air Tight was formed for the sole purpose of furthering this bribery scheme.  Now, the defendants knew when they formed this company that Christine Ponzo was not going to do any air sealing work, and yet she was the person listed on that paperwork.  In terms of the exhibit that was just mentioned where the defendants had to ask an accountant what the salary would be, that wasn't included to say her salary was inflated.  It was to show that advice was needed because she was a fake employee.  She wasn't doing any work.

Your Honor, the process of forming a company solely for the purpose of a bribery scheme is a sophisticated means. The defendants had to register the company with the Secretary

of State.  They had to obtain licenses.  They had to obtain insurance, open bank accounts and credit cards.  They also had to enlist an accountant for bookkeeping and tax purposes.  They also went through efforts to conceal the nature of this company and why it was formed.  They falsely listed employees on the paperwork they submitted to CLEAResult.  They did create those Air Tight email addresses.  Now, if these are subcontractors and it's perfectly fine to have subcontractors do your work, it's unclear why it was necessary for them to have Air Tight email addresses, but that's just one extra sophisticated step that they took.

Additionally, the defendant opened accounts in Air Tight's name.  They made purchases with these Air Tight credit cards that were personal in nature, but they were made at places like the Home Depot and Lowe's to make it look like this company had legitimate business expenses when, in fact, it really did not.

Additionally, I disagree with what the defendants say about this company not being used to conceal the source of funds.  That's exactly what it was used for.  Bribe payments were funneled through Air Tight to Christopher Ponzo and CAP Electric and they disguised as business expenses.  Your Honor, I would say this is a pretty dramatic example of a sophisticated means and the enhancement should apply.

MR. KIELY:  Your Honor, may I have 30 seconds to

respond to that?

THE COURT:  Yes.

MR. KIELY:  Beyond the tax offenses, which Mr. Christopher Ponzo is not charged with, what Miss Maynard just described is setting up a business.  To say that Air Tight was formed solely for the purposes of a bribery scheme is to beg the question.  It's ignoring the fact that Air Tight had legitimate business, which, in fact, it did.  So we don't believe the sophistication enhancement applies.

THE COURT:  The Court agrees with the government this time that sophisticated means were employed by the defendant in the commission of this crime and, therefore, a two-level enhancement is warranted pursuant to guideline Section 2B1.1(b)(10)(C).  Objection No. 4 is therefore sustained and a two-level increase is applied.  Because the resulting offense level is less than 12, the offense level is therefore increased to 12 with respect to that enhancement.

Next I'll hear with respect to objection No. 5, which has to do with role in the offense.  The Court has expressed its inclination.  I will hear from the defendant first. Mr. Kiely.

MR. KIELY:  I'm sorry, your Honor.  Were you asking about the organizer enhancement or the obstruction of justice?

THE COURT:  No.  I'm asking about the role in the offense, paragraph 71 according to the presentence report.

MR. KIELY:  Thank you, your Honor.

Again, we agree with Probation that no adjustment is justified here for any organizer enhancement, which the government is seeking under 3B1.1(c).  There's no evidence that Christopher Ponzo was directing or ordering anyone or exercising control or authority over anyone.  To the extent he was supervising anything, it was the legitimate business activities of CAP Electric, of which he is the principal.

The evidence the government points to is emails in which Mr. Ponzo is asking Eric Darlington and Peter Marra to send him contracts and to perform energy audits was Mr. Ponzo asking them to perform their legitimate job functions in the ordinary course of business.  That's their job.  There was no evidence that -- there's no evidence here that Chris is somehow functioning as a leader of a criminal organization or directing criminal activities.

Again, at base, although there's a bribery offense to which Mr. Ponzo has pled guilty, this was a legitimate business operation.  This was not a drug conspiracy.  The government points to emails, like, "I need is this contracts, homey," that Mr. Ponzo sent to Eric Darlington.  He's asking Mr. Darlington to process the contracts for customers that he's bringing in.  That's Mr. Darlington's job.

Exhibit 25, "Can you send me the Ocean Point invoice, please."  That's not a direction.  That's not exercising

control or authority.  That's a request in the ordinary course of business.

Same thing, government Exhibit 14.  "Joe, send me the list of what I owe Eric and what you will owe me."  Again, they are talking about the bribe payments there, I will submit that -- excuse me -- I will concede that but he's not ordering Joe to make a bribe payment or exercising authority.  He's asking him to send him a list.

So we don't think that there's any evidence here that would come close to satisfying the organizer role is justified or that Mr. Christopher Ponzo is organizing -- to the extent he is engaged in any kind of supervisory activity, it's with respect to the legitimate business functions of CAP Electric.

THE COURT:  Miss Maynard?

MS. MAYNARD:  Your Honor, the government disagrees and believes that this enhancement should apply to Christopher Ponzo.

If you look at application note 4 to Section 3B1.1(c), it says that the Court should consider, among other things, a defendant's exercising of decision-making authority, his nature of participation in the crime and recruitment of accomplices.  That fits Christopher Ponzo.

Christopher Ponzo started the scheme.  He recruited his brother into the scheme.  And throughout the course of this scheme and conspiracy, he did give direction to other

participants and they did follow his direction.  This is evident in the exhibits.

First of all, the defense argues that when Christopher Ponzo was asking for contracts, it was just paperwork.  On the other hand, the defense argues that the very point in these bribes was to make people, like Eric Darlington, do their job more efficiently, to do it faster.  So when you see all of these emails that the defense attached to their Sentencing Memo showing Christopher Ponzo asking Darlington again and again for contracts, that's part of the scheme.  And in response to those emails, the contracts were sent.

You see the same thing with Chris asking Joe to send him money.  Now, another part of that email, it's not just send me a list of what we owe or what you owe Darlington.  It then goes on to say "You can pay me."  He asks him to pay him, and we know, in fact, that that's exactly what happened.  Joe Ponzo sent Christopher Ponzo money for the bribe payments.  He did that in response to what Chris asked him to do.

This is a small example, but you also see it with the fact that the Chinasa employees set up these Air Tight email accounts in the first place.  Who told them to do that?  Christopher Ponzo did.  A couple months later you see that those email addresses come up.  They exist.  They did it in response to what Chris Ponzo told them to do.

Your Honor, again, this is noted in the government's

Sentencing Memorandum, but the evidence here is clear.  This is not a case like *Goncalves*.  This is a case where the defendant was asking other participants in the conspiracy to do things.  He was the director of the show.  He was telling him what to do and, in response, they obeyed.

THE COURT:  Thank you.  The Court agrees with the government that the defendant was an organizer, manager of this scheme and that a two-level enhancement is warranted pursuant to guideline Section 3B1.1(c).  Objection No. 5 is therefore sustained.

Turning to the objection No. 6 with respect to obstruction of justice, the Court has already indicated its strong inclination.  I will hear first from the defendants.  Mr. Kiely.

MR. KIELY:  Your Honor, the upward adjustment for obstruction of justice is not warranted here as Probation has concluded.  This adjustment does not automatically apply based on the 1001 conviction here.  The government still needs to show that the conduct significantly impeded or obstructed the government's investigation.  They haven't done that.  They indicted this case in a matter of days after the false statements that were charged in the 1001 count.  So those statements didn't impede anything and, moreover, they were mere denials of guilt here, which were specifically excluded from eligibility for this enhancement even where that denial does

result in a separate 1001 charge.

The government points to the fact that the statements led to a delay in the charges being brought relating to Peter Marra.  The government's decision to wait several months before adding Peter Marra via a Superseding Indictment was evidently a strategic decision they made probably to keep the grand jury open so they could retain subpoena power.  As Probation has pointed out, they knew about Marra and could have brought charges related to Marra if they wanted to when the original indictment was handed down in April of 2022.  As Probation stated in the PSR, quote, the timing does not add up.

Finally, the recorded calls Mr. Ponzo made to Mr. Darlington did not significantly impede the government's investigation.  Darlington was already a cooperating witness and he consented to the government recording the calls, which the government later used as evidence against Mr. Ponzo.  These calls actually furthered the investigation.  So for those reasons, the obstruction of justice enhancement does not apply here.

THE COURT:  Miss Maynard.

MS. MAYNARD:  Your Honor, the government believes the obstruction of justice enhancement should apply.  First of all, we maintain that it should apply automatically and that we don't have to show that the obstruction significantly impeded the investigation.  If you look at application note 5 to

Section 3C1.1, it gives a list of cases in which the enhancement should not apply, and it's within that application note that the guidelines say, however, if the defendant is convicted of a separate count for such conduct, this adjustment will apply.  It's hard to imagine what that means unless it's a carveout from those instances in which the adjustment otherwise would not apply.

Again, as cited on pages 24 to 25 of the government's Sentencing Memorandum, there are many cases in which courts have taken this same view.

Your Honor, second of all, I would say that even if the government has to show that the obstructive conduct significantly impeded the investigation, that's been done here.  Respectfully, I would say that the timeline shows exactly that.  The original indictment came down a couple of days after the defendant's interview.

It was after that, after the original indictment, that Peter Marra was given immunity and talked to the government.  This is after the fact.  And the reason for that is not because the government knew about Peter Marra and his role and just wanted to wait.  The reason for that is the government didn't understand yet Peter Marra's role.  They knew he existed.  They knew he was a project manager at CLEAResult, but there were several project managers at CLEAResult.  He was one of many.  The government did not know his role.  The defendant's conduct

obstructed the investigation and required nearly another year's worth of investigation before the Superseding Indictment could come down.

I also want to point out that the carve out here for just simply denying guilt does not apply to Christopher Ponzo because he did more than deny guilt.  He did more than just saying, I didn't do it, I didn't do anything wrong.  He provided affirmatively false statements to government agents. He provided a story that was simply not true.  That goes beyond denying guilt.

Finally, independently, the enhancement should apply because of those calls that the defendant had with Eric Darlington.  You look at these calls, he told him, quote, the story that he had told to government agents.  He said to Darlington, I don't have any paper trails, they can't prove anything with us.  It's hard to imagine what he meant by that unless he was asking him to do the same and lie to the government.

Now, I also want to point out that with respect to the call to Eric Darlington, the government doesn't have to show that that significantly impeded an investigation.  That simply fits within the fact that he attempted to unlawfully influence a witness in this case, which is what he did.

THE COURT:  Thank you, Miss Maynard.

The Court agrees with the government, that the

defendant obstructed justice because the defendant was convicted of obstructive conduct.  His false statements to agents did impede the investigation and the defendant attempted to influence his co-conspirators.  A two-level enhancement is warranted pursuant to guideline Section 3C1.1 and objection No. 6 is therefore sustained.

Objection No. 7 has to do with the zero point offender.  And because the defendant receives an enhancement for his role in the offense, he is not entitled to a two-level downward adjustment as a zero point offender.  Therefore, objection No. 7 is sustained.

Objection No. 8, by the Court's reading, is derivative of the previous objections and, therefore, it is overruled, in part, and sustained, in part, consistent with the Court's previous rulings on the first seven objections.

There are no further objections that I'm aware of.  Am I correct, Miss Maynard, to the presentence report?

MR. CHAO:  That's correct.

THE COURT:  Mr. Kiely?

MR. KIELY:  Yes, your Honor.

THE COURT:  Then we need to turn the recommendations for the guidelines.

In the presentence report, which began on page 18 wherein the Court is advised that the 2024 Guideline Manual applies, that is the most recent manual, and that within that

manual we're dealing with the conspiracy to commit honest services wire fraud, we start with the conspiracy guideline 2X1.1.

The base offense level is the base offense level from the guideline for the substantive offense.  In this case, as previously determined, that's 2B1.1 pursuant to the fact that this was a violation of Title 18 United States Code Section 1343, and that guideline applies and calls for a base offense level of 7.

Again, by virtue of the Court's previous rulings, there is no evidence of actual financial loss or reasonably foreseeable pecuniary harm to CLEAResult or the other corporations or any other individual or entity.  Since there is no financial loss, gain cannot be used as an alternative measure.  Therefore, we start off with a base offense level of 7.

As previously ruled, the offense involved sophisticated means and the defendant intentionally engaged in them.  Therefore, pursuant to Section 2B1.1(b)(10), a two-level increase is applied.  And because that provision calls for a minimum of an established offense level of 12, it is -- that is what the base offense level is now.

Then, further, because the defendant acted as an organizer or manager of the scheme for a period of nearly 10 years, Section 3B1.1(c) calls for a two-level increase and,

further, as previously determined, the defendant willfully obstructed the administration of justice under Section 3C1.1 so an additional two-level increase is warranted, resulting in an adjusted offense level of 16.

The defendant is entitled to a two-level downward adjustment for his acceptance of responsibility, therefore ends up with a total offense level of 14.

Turning to the defendant's criminal history, there are no prior scored convictions.  He, therefore, has zero criminal history points and ends up in Criminal History Category I.

That means at offense Level 14 and Criminal History Category I, the guideline sentence available is 15 to 21 months.

Do counsel agree with the Court's calculations in that regard?  Miss Maynard?

MS. MAYNARD:  Yes, your Honor.  Based on your rulings on the objections, that calculation is correct.

THE COURT:  Mr. Kiely?

MR. KIELY:  Your Honor, I'm trying to pull up the section, but I believe given the Court's calculation of the offense level here that Mr. Ponzo is entitled to a three point reduction for acceptance of responsibility rather than two.

THE COURT:  I believe the government has denied that third point because we were at the eve of trial, is that correct, Miss Maynard?

MS. MAYNARD:  That is correct, your Honor.

THE COURT:  He's not entitled to the third point.

MR. KIELY:  We object, your Honor.

THE COURT:  Your objection is noted.

I will hear recommendations for sentencing, starting with the government, Miss Maynard.

MS. MAYNARD:  Your Honor, I would like to start by acknowledging the letters that the defendant received.  I know it was over 100 letters.  That's a lot.  Clearly he has a very loving family and he has lots of support, and you can look at the courtroom here today, the number of people here.  He has support not just from his family and friends but from local school, the church, the whole community, but in many ways, that makes the conduct here even worse.

This isn't a defendant who had a hard upbringing. This isn't a defendant who was acting out of desperation to feed his family or struggling with an addiction issue.  By every account, this defendant had every advantage in the world. His conduct was driven by pure and simple greed.

Now, I want to be clear about what that conduct was. It was criminal.  You've read the defendant's Sentencing Memo. To hear him tell it, he may have technically broken the law but he didn't do anything wrong, and he supports that narrative with a number of claims that really cannot be described as anything other than fantastical.

Now, I'd like to walk the Court through some of those. The first claim is that he was only providing money to Darlington and Marra as an incentive for them to do a better job, to do the job they were already paid to do, just more efficiently.

Your Honor, meeting someone in a truck with an envelope full of cash, that's not an incentive to do a better job. That's a bribe. Paying for bathroom fixtures, for a laptop, that's not a thank you for a job well done. That's a bribe. And, your Honor, buying a $25,000 tractor for someone, that's not an incentive to do a job more efficiently. That's a bribe.

We've all been there. We've been in a long line at Target or the grocery store. You want the cashier to move more quickly, do their job more efficiently. You don't get them a $25,000 tractor as an incentive to do that. That's just ludicrous.

By his own account, Chris Ponzo was a good businessman. He said he knew how to bring in these referrals. And we know that he knew how to show appreciation for people he worked with in a business setting. He would do that. He would give his contacts. He would give his property managers $250 restaurant gift cards at Christmas time. That's not what he was doing with Darlington and Marra. It just doesn't make sense to pay millions of dollars in bribes unless it's worth it

from a business standpoint.

Christopher Ponzo was a smart businessman and he knew for him it was worth it, and it was worth it because he got something in return.  He got preferential treatment that added up to millions of dollars in his pocket.

Now, the second fantastical claim here is he gave this money out of a sense of fundamental fairness.  The defendant claims that he was making all this money, but Darlington and Marra, they were overworked and underpaid, so it was just fundamentally fair to give them all of this cash and these gifts but, your Honor, we know that's simply not how the defendants work.  We know that based on Chinasa, the defendant who did the work for Air Tight.

From 2015 to 2019, roughly a 5-year span, Air Tight brought in over $7 million from CLEAResult.  Of that, Chinasa and its employees over 5 years received less than $600,000.  That's less than 10 percent of what came in given to the people who were actually doing the work.  Where's the fundamental fairness there?

It's simple.  This had nothing to do with fundamental fairness.  Christopher Ponzo was giving cash and other gifts to Darlington and Marra because they were bribes and he wanted something in return.  He wanted something beyond what was in their job description, and that's what he got.

The third fantastical claim that the defendant makes

is that he brought his brother Joe on as a CLEAResult contractor because he was tired of fielding complaints from customers about a lack of contractors' professionalism. He wanted somebody he trusted, he says, to be on these jobs. Well, again, this just isn't credible.

You look at the facts here. If the point is that he wanted somebody he knew and trusted on these jobs and at the job sites, then why was all of the work subcontracted out? Why did it go to a company made up of employees who had no prior experience in air sealing? Why did the work go to people he didn't know who just so happened to respond to a Craigslist ad? This just doesn't add up. The truth is, it was not about having someone he trusted. It was about expanding the scheme. It was about making more money.

Now, from what I understand, the defendant and his brother are very close, so this makes sense. He wanted his brother to get in on this too, and he did. Air Tight brought in $7 million for jobs that Joe Ponzo didn't even have to show up to. Christopher Ponzo simply wanted his brother to enjoy the same fruits. He wanted him to be able to have a vacation home in Florida. He wanted him to have a lake house in New Hampshire. That is the real reason that Christopher Ponzo brought his brother in on the scheme.

Now, the fourth fantastical claim here is that Christopher Ponzo actually provided a benefit to CLEAResult.

The way the defendant tells this story, he shouldn't be here today for sentencing, for punishment, he should be getting a reward.  He says he didn't need CLEAResult, CLEAResult needed him.

Your Honor, I just want to be clear here about the type of work, first of all, that the defendants were doing. They were screwing in light bulbs and spraying in air foam. Everybody could have done that work.  It's not that the defendants were just so special and so good at it.  And they were overpaid for this work.  They received preferential treatment in exchange for bribes.  Your Honor, I want this to be clear.  Bribing a company's employees and dividing their loyalties, that never benefits the company, ever.

Now, the final fantastical claim I want to address here is defendant's claim that there was no inflation of contracts.  Now, we've already touched on this a little bit, but I think it's important that the defendant is grossly misrepresenting the way CLEAResult and Mass Save contracts worked.  And the defendant knows that better than anybody.

Now, he makes much of the fact that he purportedly brought in a bunch of referrals, but once those referrals are brought in, they still have to be approved.  Somebody has to go to that job site and say, yeah, this makes sense, we need to do energy efficiency work here.

That's where Darlington and Marra came in.  They

approved jobs that didn't need to be approved.  And even if they should have been approved, then they were creating contracts based on false numbers.  Your Honor, to say that these contracts weren't inflated is just false.  There's no other way to say it.

Now again, we touched on this earlier, but the defendant makes much of the fact that these guidelines existed, there were hourly rates.  There were suggested hours based on square footage, but if the person going to the property is overestimating the square footage of the property, those hours increase.  That's what was happening.  Darlington and Marra had the ability to manipulate the contracts, and that's exactly what they did.

I know I talked already a lot about the Pinehills inspection.  I also mentioned Wellington.  That's a job you can see at Exhibit 22 of the government's Sentencing Memorandum.  Bill Footer sends an email saying, whoever did the Wellington job did a shitty job.  And if you look at the last page of that exhibit, you'll see that over a thousand hours were billed for that job and it failed.  It completely failed inspection.

You can also look at Exhibit 23.  That's the Bear Hill inspection report.  There's pictures there showing where air sealing wasn't even done, wasn't completed at all.

We also have this example from a Buzzuto property.  That shows where manipulation could be done with respect to

electrical contracts as well.  Now, in that case, an Eversource employee just happened to do a spot check.  She did a random spot check.  And when she did, she felt that things were not done properly.  She found that, for example, the wattage of the bulbs that had existed in the first place were overstated.

Now, wattage and bulbs and all that sort of thing, that gets into technical details about when an energy efficient property would be justified, but if you think of it more simply, if the bulb costs a dollar per hour when you have it on and you can replace it with a bulb that costs $0.50 an hour, then maybe it's worth paying somebody to come in and see those light bulbs because you're going to see those savings.

Well, if the person in this case, Eric Darlington, overestimates the savings that you would see, then a job might be approved that should never have been approved in the first place.  And that's what this Eversource employee saw happening.

Your Honor, I also want to note that the defendant's own Sentencing Memorandum shows this, shows the fact that Darlington was inflating contracts.  If you look at Defense Exhibit 32, this is from Bill Footer's interview with the government, he talks about what happened after that Buzzuto inspection.  He says that Darlington's work was reviewed and CLEAResult found that Darlington overestimated the cost of his projects by roughly $2 million.  He went on to say that Chris Ponzo and Joe Ponzo worked the majority of those projects.

Your Honor, the defendant claims that these contracts were not inflated.  Again, it's just simply not credible and it misrepresents the contracting practices.  Now, the defendants pled guilty because they knew that a jury would reject these preposterous arguments.  So should the Court.

This brings me to my next point.  When you look past the defendant's fantastical claims, you'll see there was real harm here.  First of all, the defendant's conduct disrupted faith in the Mass Save program.  The money for this program comes from rate payers.  This is every person in Massachusetts who pays an electricity or gas bill.

We provided an example at Exhibit 1.  You can see that there's a surcharge listed on the bill.  Again, this is every consumer, and this is real money.  It adds up.  It can be a hundred dollars or so for an average person.  That's who's funding this program.  It's real money from real people.  It's not play money just out there for the taking, but that's how the defendant treated it.

Now, the utilities set a budget based on the costs of these projects and, according to that budget, they increase the surcharge that rate payers pay.  So the public is invested in these programs, but when somebody like the defendant takes advantage and corrupts the program, that destroys the public's trust in what they're paying for.

This was also unfair because people lost their job.

Eric Darlington, for example, after this Buzzuto spot check that revealed he was inflating contracts, he ended up getting fired.  And Peter Marra, after the Pinehills inspection, he received a formal discipline report, all the while the defendants are off making millions.  Darlington and Marra were simply collateral damage to them.

Finally, and I won't belabor this point too much because we've already talked about it a lot, but there was real harm in the overbilling here.  When the subcontractor from Chinasa saw the differences in these invoices, he was horrified.  He had no idea that this was happening.  And you've seen the examples.  You've seen Pinehills.  You've seen Buzzuto.  The defendant want to make a lot from the fact that there aren't a lot of examples, but there are a couple of things to point out about that.

First of all, Darlington and Marra were the very people who were supposed to be overseeing the work, doing quality control, doing checks, but they were receiving bribes so they were not doing that and, for that reason, we don't have a lot of examples.

But there's another thing that Darlington and Marra would do and, again, this comes from the defendant's Sentencing Memo.  If you look at Exhibit 24, you'll see at paragraph 38 that Eric Darlington said he would give Chris Ponzo advance notice of third party inspections.  He did this because, quote,

it allowed them to fix poor work before it was inspected.

Now, the defendant also makes a lot of hay about the fact that he had a lot of customer reviews.  And some of those customers, they were happy, and they should have been happy.  They were getting work done for free.  They weren't the ones having to pay for it.  Also, those customers were property managers.  In a lot of cases, they never even stepped foot on the property.  They didn't see what was happening.

Mark Delisi, for example, from the Avalon properties, he didn't come and inspect the work that was done but, you know, he got decent reports.  He knew he didn't have to pay anything.  He was satisfied but, again, these are property managers.  These are not energy efficiency coordinators.

When you look at CLEAResult and the utilities, the people overseeing these funds collected from the public, their goal was to fund projects that resulted in energy savings.  And when the defendant was doing work that was either based on an overinflated contract or where the work just simply wasn't done, those funds were wasted and the energy savings did not result.  Your Honor, the harm here is real.

The final point I want to make is that this defendant has engaged in a pattern and practice of dishonesty over the course of years.  The defendant lied to CLEAResult.  They lied about the work that was being done.  They lied on invoices.  They even lied about who was employed by Air Tight.  The

defendant claims, this is another one of those fantastical claims, that Chinasa employees were inadvertently listed on paperwork that went to CLEAResult, but if you look at government's Exhibit 30, when Joe Ponzo sends that paperwork over, it says, "Here's the background check for my second employee."  There's no other way to take that.  That one was not inadvertent.

Now, the defendant engaged in this pattern of dishonesty for years.  This was not a one time lapse in judgment.  He lied and bribed his way into millions of dollars, year after year after year, and when he was finally confronted with his crimes, he lied to federal agents.  What's worse, after telling his own lies, he encouraged his co-conspirators do the same.  In his own words, he told Eric Darlington, they can't prove anything with us.

Your Honor, the defendant's conduct here and the crimes he committed, it warrants a serious sentence.  The minimization of the criminal activity I think may be one of the most upsetting things here.  The defendant continues to shirk responsibility and promote this narrative that's directly contrary to what he already admitted to during his plea.

Your Honor, a serious sentence is also warranted here because of the harm.  The harm here was real.  It's also needed to restore faith in the Mass Save program.  The defendant's conduct should not be rewarded through a pattern of bribery,

corruption and dishonesty.  The defendant made millions and millions of dollars.  His conduct sends the message that crime pays, but this Court knows better.  Crime should not pay.

Now, for those reasons and based on the guideline as the Court has calculated them, the government believes that a departure is warranted here and the government recommends a sentence of 97 months incarceration and a $250,000 fine.

Thank you.

THE COURT:  Thank you.

Mr. Kiely.

MR. KIELY:  Thank you, your Honor.

Chris Ponzo is sitting here today because he pleaded guilty.  He pleaded guilty because he is guilty.  He has accepted responsibility for his offense and he understands that today he will be punished for his conduct.

The government asking you to sentence Mr. Ponzo to 97 months in prison is based principally on the value of contracts which they say he was awarded in exchange for bribe payments.  The government has this case backwards.  And what I find fantastical is the government's insistence that this was a money for contracts case in the face of unrebutted evidence from the defendant that Mr. Ponzo originated more than 90 percent of the contracts that he worked through CLEAResult and that he was entitled as a matter of CLEAResult policy to work those contracts.

The government said at page 22 of their Sentencing Memorandum that, quote, this was not a run-of-the-mill fraud scheme where an existing company paid bribes for contracts.  We agree this is not a run-of-the-mill money contract scheme.  We think that for different reasons than they do.

Here is what is different and the key differences in terms of what the punishment should be.  First, Chris Ponzo brought in these contracts, more than 90 percent of them.  Second, he was entitled to work those contracts as a matter of established CLEAResult policy.  Third, he was paid fixed, non-negotiable prices that were set by contract between CLEAResult and the utilities.

He made a lot of money, yes, but CLEAResult made a lot of money off of Chris Ponzo.  Every customer and job he brought to them, the more money they made.  They got paid 60 or $70 per unit for buildings that had 100, 200, 500 units.  And in the case of National Grid, a 15% fee on top of that.

The government said at page 1 of its memo that, in exchange for regular cash payments and extravagant gifts, two inside employees made sure that Mr. Ponzo and his brother Joe received an inordinate share of Mass Save contracts and, two, that those contracts were lucrative.  Both of those assertions are false.

First, with very limited exception, Chris Ponzo generated the jobs that he and Joe worked and he brought those

jobs to CLEAResult.  According to CLEAResult, quote, the vast majority of multifamily residential projects are self-generated leads by participating contractors.  That's Exhibit 27.

In Exhibit 28, Mr. Cote's FBI interview, he said, in Massachusetts, most of the multifamily residential work is brought to CLEAResult by contractors.  The unrebutted evidence in the record and in the form of Mr. Ponzo's declaration and the expert declaration of Rebecca Greco, financial analyst, is that over 97 percent of CAP Electric's contracts measured by revenue came from a source other than Eric Darlington or Peter Marra.  Over 93 percent were originated by Chris himself.  It was not Darlington and Marra that made sure Chris received a large number of Mass Save contracts.  It was Chris Ponzo himself.

It is further undisputed that Chris Ponzo was entitled as a matter of CLEAResult policy to work those jobs which he brought in.  Exhibit 29 of our memo at page 37, quote, if a contractor brings a customer into the program, which is very common, we don't take that work, that's their customer, we wouldn't take that away.

At page 32, if a customer brought a customer to CLEAResult, they would complete that project.

Exhibit 33, he, referring to Chris Ponzo, brought the leads so he gets the work.

Those are statements by higher-ups at CLEAResult, both

in contemporaneous emails and their testimony before the grand jury.

Accordingly, with respect to all those jobs that Chris brought in himself, there was no decision about who was going to be awarded that work that was capable of being influenced by the money Chris was paying to Darlington or Marra.  How did Chris generate this work?  Through old-fashioned hustle.  He knocked on doors and he made cold calls selling property managers on benefits of the Mass Save program.  He was persistent and he got people to listen.

By the way, in response to something that Miss Maynard said that people were just property managers, first of all, I don't really know what that means, but, second of all, Mr. Ponzo's contacts at many of these companies actually were the people who were charged with spearheading their energy efficiency and sustainability efforts.

I would refer the Court to Exhibits 6 through 17 of our Sentencing Memorandum for just some examples of Mr. Ponzo going out and getting this work.

Mr. Ponzo then proved himself to these property managers, did good work, and they came to trust him and gave him repeat business, which he brought to CLEAResult.  Refer to Exhibits 18 through 23 of our memo.

Mark Delisi of Avalon Bay testified in the grand jury, "CAP was doing a good job.  I really trusted the work and I was

getting no negative feedback, so, you know, we were working with a vendor who was good.  We'd like to continue working with them.  It was really as simple as that."

Bill Terrio of Avalon Bay wrote in an email, "Mark Gallagher has updated me on the project yesterday.  He's very impressed with the professionalism of you and your team, as am I.  Your focus to detail, communication and customer service is greatly appreciated, as are the cost savings associated with this and the Station 250 projects.  We look forward to continuing to work with you."

Numerous other examples.  Peter Zadoretzky -- which are cited Exhibits 18 through 23 of our memo.  I would point the Court to Peter Zadoretzky, a letter of recommendation.  He wrote, "CAP has been an invaluable partner", from Buzzuto, "CAP has been an invaluable partner in helping us achieve those goals" of energy efficiency "over the last 5 years" ... "to onsite LED-retrofitting, unit sealing, and hi-performance shower head installs" ... "Chris and his team have exceeded expectations time and again.  CAP also gets rave reviews from our site teams on their professionalism, cleanliness and any follow-up needs."

Second, it is simply not true, as the government contends, that Darlington and Marra made sure the jobs were lucrative.  The contracts between CLEAResult and the utilities did that.  Prices were set by contract with the utilities.  And

I addressed this earlier.  I would refer the Court to Exhibit 57 and 58, which is the contract with the utilities that contain a schedule of the prices for the lighting fixtures and for air sealing.

The government says at page 19 of its memo, well, there was likely manipulation of these prices.  There's absolutely no evidence of that.

So if it was not in exchange for contracts, what was the money for?  It was simple.  It was Mr. Ponzo gave cash and gifts to Eric Darlington not in exchange for contracts but to motivate him and to reward him to go the extra mile to perform the energy audits and process the necessary paperwork in order to allow Chris to actually perform the jobs in a timely manner and keep his customers happy.  It is this productivity that he was trying to influence.

Chris is not trying to shirk responsibility, as the government accuses, by characterizing the quid pro quo in these terms.  Mr. Ponzo knew that Darlington and Marra, were in Marra's own words, overworked and under paid.  He knew they received no commission or bonus based on their productivity, and he knew that, unless he supplemented their income, they would have little incentive to put in the extra effort that was required to stay on top of the large volume of work that Chris was bringing to CLEAResult.  Darlington communicated this to Chris regularly, continuously making references to his low pay

and dropping hints about his needs.

Next, while -- as Mr. Ponzo has admitted, he deprived CLEAResult of the honest services of its employees of Darlington and Marra, and for that he has pled guilty.  Not only was there no economic loss, as the Court has found.  Chris actually provided an economic gain to CLEAResult.  The Mass Save program is lucrative.  It was lucrative for Chris and it was lucrative for CLEAResult.

As I said, National Grid paid CLEAResult a 15 percent commission on every job it oversaw.  Eversource paid a monthly management fee equal to approximately the same margin and both utility companies paid per unit audit fees of $60 to $70. CLEAResult relied on its contractors to source jobs.

The more jobs Chris Ponzo brought to CLEAResult, the more money CLEAResult made.  There is no disputing -- excuse me -- Chris Ponzo was one of CLEAResult's most productive contractors in terms of business generation, and there is no disputing that he made CLEAResult a lot of money.

I would point your Honor to Exhibits 51 through 53 of our memorandum, which show Bill Footer, who was at the time the head of the multifamily program, he's not someone who is accused by the government as taking bribes, he was Darlington and Marra's boss and he was constantly pushing both Darlington and Marra and other members of the CLEAResult workforce, but Chris Ponzo himself to help them hit their quarterly and annual

sales targets.  He was constantly on top of Chris to perform and bill for more and more work.

Exhibit 51.  "Will you guys be submitting anymore invoices this month?  Looking to pull in as much as possible."

Exhibit 52, "I just need to know what I can count on you guys for in the next couple months.  Under some brutal pressure here."

Exhibit 53, "Sorry, guys, I just really need to know what we have nailed down for the next two months.  Our production is being reviewed on a daily basis and I can't have a big miss at the last minute."  And there are countless more examples of that in the discovery in this case.

Finally, it bears emphasizing that, contrary to the government's misleading narrative, the public was not victimized here.  The Mass Save program is not a public program and Mass Save funds are not public funds.  Mass Save is just a brand named under which private for profit utility companies offer energy efficiency upgrades to their customers.  This is not something the utilities are doing out of some sense of civic obligation.  What the customers get out of the program are free and low cost upgrades and reductions in their monthly utility bills and the utilities own the resulting savings and they can trade that for profit at market.

Contrary to what the government contends without any legal or factual support, contractors like Chris Ponzo could

not owe a fiduciary duty to the utilities or the public.  These are funds collected by the utilities from their customers and they are doled out to private contractors to spend according to the terms of the contract.

The Mass Save program is not on trial here.  The government evidently believes that the program is not serving the interest of Massachusetts energy consumers in the way that the government believes it should.  There is no question that the Mass Save program is very lucrative to lead vendors like CLEAResult and participating contractors like CAP Electric.  The economic terms of the program are a matter of contract, which are negotiated by the utilities.

Beyond the payments to Darlington and Marra, for which he has pleaded guilty and accepted responsibility, Chris Ponzo played within those roles as they existed.  Capitalism is not on trial here either.  If the utilities believed that they could achieve their energy savings goals more cleanly or efficiency or otherwise better serve Massachusetts consumers through a different program structure, such as one which eliminated intermediaries like CLEAResult, then they can pursue reforms of the program.  What should not be happening is punishing Chris Ponzo for taking advantage of a legitimate business opportunity.

The cases that the government has cited in support of their recommended 97-month sentence are totally inapposite.

In the *Carrasco* case, the defendant was a public official who awarded public contracts in exchange for bribe payments.  He was charged under Section 666, federal programs bribery.  A different guideline was applicable to that.  It's nothing like this case.

*Doherty*, the Eastern District of Pennsylvania case cited by the government, there were numerous charges against that defendant, including federal programs bribery, embezzlement and tax charges.  The defendant there embezzled $500,000, not comparable in any way.

Finally, *Figueroa*, a Second Circuit case, the defendant was a federal official.  He was an employee of the SDNY Clerk's Office who took bribes in exchange for referring criminal cases to defense attorneys.  He was charge under the federal bribery statute, Section 201(b), and sentenced under 2C1.1, again, not a comparable precedent.

The vast majority of defendants, something like 90 percent sentenced in this district under 2B1.1 with a guideline range of zero to 6 months, which is what we believe is the correct applicable guideline range in this case, received sentences of Probation or time served.  See Exhibit 62 of our memorandum with that statistical analysis.  We do not believe there is any reason to depart from that norm in this case, and doing so would create an unwarranted disparity.

So, for that reason, based on the manner on which your

Honor has calculated the guideline range, we believe a downward departure is appropriate here.

Let me briefly address Mr. Ponzo's history and characteristics. Mr. Ponzo's history and character also support a sentence of Probation. He stands convicted of this crime but he is not a criminal. He is a person of high moral character who regularly goes out of his way to help others and to give back to his community. He's given tens of thousands of dollars to people in need, donates hundreds of hours of his time every year serving his community. He goes out of his way to help others in their time of need: The teacher, and this is outlined in the memo in the letters, the teacher whose husband needed a stair lift installed; the neighbor whose furnace blew up the night before the closing on his house. Every Christmas he drives around town with his brother Joe and gives out thousands of dollars worth of gifts to the less fortunate.

And the outpouring of support for Chris and the more than 120 letters we've submitted, many of them from people sitting in this courtroom today, demonstrates he is fundamentally a good person who regularly engages in selfless acts with no expectation of receiving anything in return in order to help people who are in their time of need and to better his community. The conduct for which he has pleaded guilty is not at all representative of who he is as a person, and given his usual moral compass, the Court need not be

concerned that he will re-offend.

He is a dedicated family man with three young children who need him.  He has 30 employees he needs to support by doing what he does best, in generating business for CAP Electric.  An Absence from the business for any amount of time would be devastating to the business and the employees.

With that, your Honor, we would ask that you impose a sentence of Probation with a significant element of community service as a condition of that Probation.

Thank you.

THE COURT:  Thank you, Mr. Kiely.

Does the defendant wish to address the Court before sentence is imposed?

THE DEFENDANT:  Thank you, your Honor for hearing me.  I'm obviously a little nervous.  I hope you don't mind I'm reading this.

So how did I get here?  My father-in-law had done some work for Mass Save program and he introduced it to me.  They had done some work with them.  He said it was a great thing to get into.  I paid generously with large standard rates, no competitive bidding, no cost estimates, no negotiations, no requirements other than basic licensure and insurance, and the policy was, if you brought in the work, your Honor, you were entitled to the work.

I started out with four or five small properties of my

own that I acquired over the years.  When I was successful, it occurred to me this program could interest management companies, and I had a lot of connections and I thought this would be a good opportunity, so I tried it out.

I first wrote to John Corcoran of Corcoran Management. I have never met with Mr. Corcoran.  I sent him a cold call and explained to him the benefits of the program and I kind of laid it out in an email about the upgrades on energy savings and cost.  It was at that point Mr. Corcoran responded back to me. He liked it.  He tried it out.  It proved to be very beneficial, so I pursued more.

I sent out email after email and I built out a large clientele of other management companies:  Lincoln, Signs, Wingate, Buzzuto, Avalon Corporate, amongst many others.  When I learned there was also a great demand for air sealing, which didn't require any particular expertise, I introduced my brother to what I thought was a great opportunity to get him involved.

The customers were asking for more and more and CLEAResult, which made quite a bit of money from its share of the utility payments, kept asking me for more and more as well. They were asking me to go faster, bill more, push faster, do as much as we can for them.  I was regularly working close to 18 hours a day on emails, phone calls.  I was nonstop.

Eric Darlington was my project manager.  He did the

intake, which involved assessments of the properties, documentation of existing fixtures, how many of a kind, the eligibility, et cetera, but he couldn't keep up, not for 60,000 a year and not when he knew how much I was making, and he made a point of telling me on several occasions about his needs and how little he was paid.

I also thought I should compensate him when he did ask what I did ask of him.  I was pushing him a lot.  I was asking him to look at a lot of jobs for me.  I was e-mailing him late at night.  I was calling him late at night.  I did ask a lot of him.  So I gave him money in cash and I gave him gifts.  I wanted him to work fast and be there whenever and wherever I needed him to do assessments and processing the jobs.  I also paid him to do invoicing for me as well.

I lost all perspective.  I think I had a pretty good idea this was wrong.  The company had a right to know what its employee was doing and whether it agreed to it.  If I needed more support for my work, I should have gone directly to CLEAResult openly to try to find a way to solve their problem rather than paying Eric and Peter Marra on the side.

I've spent most of my life, your Honor, trying to make an honest living to help people in need, to respect the rights of others, so I regret the decisions I've made, which I did voluntarily and deliberately.  I violated the law.  I have no doubt of that.  I regret the harm I brought to my family and my

brother's family, my employees and everyone who has been effected.  I do sincerely apologize, your Honor.

Thank you, your Honor.

THE COURT:  All right.  Thank you.  Do counsel know of any reason why sentence ought not to be imposed at this time?  Miss Maynard?

MS. MAYNARD:  No, your Honor, but I would like to make a couple of points that I forgot to make earlier:  First of all, that representatives from CLEAResult and Eversource are here just in case the Court would want to hear from them, but they are here.

The second thing that I want to note for the record, the government does move for forfeiture pursuant to 18 U.S.C. 981(a)(1)(C) and 28 U.S.C. 2461 as set forth in the indictment and as raised at the Rule 11 hearing.  We would ask that the Court defer ruling on forfeiture until our Asset Recovery Unit has time to make a motion, and the defendant obviously would have time to respond to that.

THE COURT:  So this has to do with forfeiture?

MS. MAYNARD:  Yes, your Honor.

THE COURT:  All right.  What are you asking the Court to do?

MS. MAYNARD:  We would ask the Court defer judgment on forfeiture, but the government is moving for forfeiture of the proceeds that the defendant gained as a result of his conduct

of conviction.

THE COURT:  When I get to that portion of the sentence, I'll ask you to supplement or offer your suggestion as to the ruling.

Do the victims wish to address the Court, because if they do, they have a right to do that?  I'm not sure what you told me is asking for a statement of a victim.

MS. MAYNARD:  The representative from CLEAResult has indicated that she would like to say something.

THE COURT:  Then she may do so.

And please identify yourself for the record.

MS. WALTERS:  Sarah Walters.

MR. KIELY:  We would object to this for the reasons articulated in our motion.

THE COURT:  I understand.  I have denied that motion, so I'm going to allow the victim to make a statement.

MS. WALTERS:  Thank you, your Honor.

First of all, Kevin Cote, who heads the multifamily program for CLEAResult and is the author of the letter, had planned to attend today and became very ill and so that is why I'm here and representing them as their counsel.

I just briefly want to make two points, your Honor. The defendant spent a lot of time talking about the lack of loss here, and while we certainly understand and respect the Court's decision on how the guidelines apply given the way the

case was charged, as we've laid out, there was real loss.

There was real loss to CLEAResult in an amount of almost $400,000 paid to the Ponzo's that they have not been able to recoup and there was real loss in millions and millions and millions of dollars of contracts that they did not get when it became clear that they had corrupted employees that had been corrupted by the Ponzo's conduct.

So regardless of whether it's recognizable under the guidelines, there is real loss to the victim here.  And what that loss led to was the loss of jobs of people who were not corrupted on CLEAResult's payroll because of the significant loss of the contracts.

So while the government refers to Mr. Marra and Mr. Darlington as collateral damage, respectfully, their former employer believes they had deserved to be fired because they had been corrupted, but there were a lot of people who did not deserve to lose their jobs and, to me, that defines what honest services fraud is, that people who were not corrupted and were trying to do their job the best they could are true victims of a corrupt scheme.

With that, your Honor, we appreciate the opportunity to make a statement.

THE COURT:  Thank you.

Anything else from the government?

MS. MAYNARD:  No, your Honor.

THE COURT:  Do counsel know of any reason why sentence ought not to be imposed at this time?

MR. KIELY:  Your Honor, may I just respond to that statement from Miss Walters?

THE COURT:  Yes, you may.

MR. KIELY:  We've set forth in our motion to strike, which your Honor indicated he would treat as an opposition to the victim impact statement, just two very quick points.

The attorneys' fees for assisting the government in its investigation are expressly excluded from the definition of recognizable loss under the guidelines.  The amounts that utilities refused to pay to CLEAResult after the indictment, we've seen no proof of that, but I do know that after the indictments were handed down, CLEAResult refused to pay to Mr. Ponzo's company hundreds of thousands of dollars, which had owed him for work that he had already performed.  So there's no loss there.

And, lastly, as to the claim that CLEAResult lost out on contracts because of the indictments against Mr. Ponzo and the faithlessness of their own employees, again, there's absolutely no evidence substantiating that, much less establishing a sufficient causal connection to the indictments here.  There's record evidence that we've cited that Eversource in particular was unhappy for years with CLEAResult's performance for reasons having nothing to do with the Ponzo

brothers.  Marge Kelly and Eversource described Bill Footer, the program manager over at CLEAResult, as being lazy and asleep behind the wheel for years.  So there is no evidence.

And moreover, I would say, as set forth in our motion, we sought for months any information about any claim of loss by any of the victims in this case and received no responses to that.

Thank you, your Honor.

THE COURT:  All right.  Now does counsel know of any reason why sentence ought not be imposed?  Miss Maynard?

MS. MAYNARD:  No, your Honor.

THE COURT:  Mr. Kiely?

MR. KIELY:  No, your Honor.

THE COURT:  Please stand, Mr. Ponzo.

Mr. Ponzo, you stand convicted of an egregious economic crime whereby you were the mastermind of a scheme to take advantage of a multi-billion dollar state program intended to promote the conservation of energy.  You bribed employees of the administrator of that program, got your brother involved and, eventually, your companies were paid multimillions of dollars of contracts under that program.

Your crime had a very significant impact upon the administrator of the Mass Save program and, according to its victim statement and statement just now, cost them at least $400,000 and substantial harm to its reputation and other

employees, and this fraudulent scheme was conducted for a period of nearly 10 years, and after it was discovered, you lied to the investigators and encouraged your co-conspirators to do the same.  It's unclear exactly how much you made out of this scheme but clearly it was multimillions, apparently somewhere around 13 million.

You deserve to serve a jail sentence not only to deter you from ever doing this again but also to deter anyone else who thinks that he or she can take advantage of the admirable conservation program out of motives of greed and avarice and not pay a price.

Before I impose sentence, I will say that even if I had not found that the various add on conditions that I found were present, I would still impose an upward variance or an upward departure.  I believe that under Section 5K2.0(a)(1)(B) of the guidelines, I have discretion to impose an upward departure and, further, that I also have the discretion to impose an upward variance under the circumstances of this case. The defendant's crime is the more egregious than what is reflected in the defendant's calculated total offense level.

Therefore, pursuant to the Sentencing Reform Act of 1984 and having considered the sentencing factors enumerated in Title 18 of the United States Code Section 3553(a), it is the Judgement of this Court that you, Christopher Ponzo, are hereby committed to the custody of the Bureau of Prisons, to be

imprisoned for a term of 27 months.

This term consists of terms consisting of 27 months on superseding Counts 1 through 25 and 31, such terms to be served concurrently.

Upon release from imprisonment, you shall be placed on a term of supervised release for 2 years. This term consists of terms of 2 years on superseding Counts 1 through 25 and 31, such terms to run concurrently.

Within 72 hours of release from custody of the Bureau of Prisons, you shall report in person to the district to which you are released.

It is further ordered that you shall pay to the United States a fine of $300,000. It's further ordered that you shall make a lump sum payment of that $300,000 within 60 days of sentencing.

Any fine imposed is to be continued to be paid until the full amount, including any interest required by law, is paid. All fine payments shall be made to the Clerk of United States District Court. You are to notify the United States Attorney for this district within 30 days of any change of mailing address that occurs while any portion of that fine remains unpaid.

The Court, at the request of the government, will defer any finding of forfeiture.

Miss Maynard, do you wish to add at this point the

provisions that you requested?

MS. MAYNARD:  Yes, your Honor.  We're seeking forfeiture pursuant to 18 U.S.C. 981(a)(1)(C) and 28 U.S.C. 2461.  We would seek approximately 13.2 million in forfeiture. That represents the proceeds that this defendant made from his crimes.

THE COURT:  And the government's proposal is to formalize that at what point?

MS. MAYNARD:  As soon as possible.

THE COURT:  Well, that's going to mean within one week.

MS. MAYNARD:  We can do that.

THE COURT:  Within one week you will make clear to the Court what the forfeiture provision is pursuant to the sections of the statute that you quoted.

Further, while under the Probation Office's supervision, Mr. Ponzo, you shall comply with the following terms and conditions:

First, you shall not commit another federal, state, or local crime.

You shall not unlawfully possess a controlled substance.

Drug testing conditions are suspended based upon the Court's determination that you pose a low risk of any future substance abuse.

You are to cooperate with the collection of a DNA sample as directed by the Probation Officer.

You are to comply with the standard conditions that have been adopted by this Court and are described in the Sentencing Guidelines at Section 5D1.3(c), which will be set forth in detail in the Judgment and Committal.

The following special conditions apply during your supervised release:

You are prohibited from engaging in contract work with energy efficient programs, such as Mass Save.

You are to pay the balance of any fine imposed according to a court-ordered repayment schedule and are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligation remains unpaid, and you must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the United States Attorney's Office.

It is further ordered you shall pay to the United States a Special Assessment of $2,600, which shall be due and payable immediately.

Mr. Ponzo, you have a right to appeal this sentence. If you choose to appeal, you must do so within 14 days.  If you cannot afford an attorney, an attorney will be appointed on your behalf.

Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  It is further ordered that you are to self-surrender at an institution designated by the Bureau of Prisons on Wednesday, March 19, 2025, before 2:00 p.m.

Is there any further business to come before the Court in these proceedings?  Miss Maynard?

MS. MAYNARD:  No, your Honor.

THE COURT:  Mr. Kiely?

MR. STERN:  Your Honor, would you make a recommendation to the BOP for an institution that is close to his home?

THE COURT:  Yes.  Consistent with the security level that the Bureau of Prisons finds appropriate, the Court recommends that the defendant be incarcerated in a facility closest to his home.

MR. STERN:  Thank you.

THE COURT:  We are adjourned.

THE CLERK:  All rise.

(The Honorable Court exited.)

(Adjourned, 4:57 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS    )


        I, Kristin M. Kelley, certify that the foregoing is a correct transcript from the record of proceedings taken February 5, 2025 in the above-entitled matter to the best of my skill and ability.


        /s/ Kristin M. Kelley              February 7, 2025

        Kristin M. Kelley, RPR, CRR              Date
        Official Court Reporter