IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH PONZO and<br>CHRISTOPHER PONZO,<br><br>Defendants. | ) | Case No. 22-cr-10094-NMG |

**DEFENDANT CHRISTOPHER PONZO'S OPPOSITION TO THE GOVERNMENT'S MOTION FOR FORFEITURE**

## I. Introduction

The government seeks to financially ruin Christopher Ponzo by forfeiting from him $13.2 million which he legitimately earned—representing the majority of his business earnings for the better part of a decade—without a shred of evidence that the sum represents profit from Mr. Ponzo's criminal offense. No matter how much the government wishes it were so, this is not a money-for-contracts case. The unrebutted record evidence establishes that: (i) Mr. Ponzo self-generated over 93% of the work which he brought to CLEAResult; (ii) he was entitled as a matter of CLEAResult policy to complete jobs which he self-generated; and (iii) he was paid fixed, non-negotiable prices for the work performed. The government concedes it has no evidence that any of CAP Electric's contracts were inflated or otherwise manipulated as a result of the offense to which Mr. Ponzo pleaded guilty. At best, viewing the evidence in the light most favorable to the government, only $164,786 of the $13.2 million net income figure put forth by the government (i.e., the profit from the less than 2% of contracts which Mr. Ponzo did not

generate and which were assigned to him by Eric Darlington or Peter Marra) "constitutes or is derived from proceeds traceable" to Mr. Ponzo's offense and thus properly subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

There is no disputing that Mr. Ponzo's participation in the Mass Save program as a contractor for CLEAResult was enormously lucrative. This is a function not of any criminal scheme, but of the manner in which the Mass Save program was structured by the utilities. The utilities set the criteria for determining a property's eligibility for energy efficiency upgrades, and they set the prices to be paid by CLEAResult to its contractors to perform those upgrades. Mr. Ponzo regularly sourced and brought to CLEAResult hugely lucrative jobs upgrading large apartment buildings consisting of hundreds of units, each of which might generate more than $100,000 in revenue to CAP Electric. By way of example, in one of its busiest years, 2017, CAP Electric brought in around $5.7 million in revenue from CLEAResult Mass Save jobs, generating over $2.1 million in revenue *for CLEAResult* in the process (and $3.5 million worth of savings to the utilities). *See* Ex. 26.[1, 2] This is a large amount of money by any measure, but it was just a small fraction of the annual Multifamily Program budget overall. To provide further context, that same year, the number one ranked CLEAResult Multifamily Program contractor, I-Con Global Inc., generated over $4.2 million in revenue for CLEAResult—*double* what CAP Electric brought in. This means that I-Con Global, who is not accused of any wrongdoing, likely generated for itself more than ***$11.4 million*** in revenue from CLEAResult Mass Save jobs that

---

[1] To be clear, these numbers are revenue numbers before direct costs are deducted pursuant to 18 U.S.C. § 981(a)(2)(B), not "net income" numbers on which the government bases its forfeiture request.

[2] Exhibit numbers 1 through 62 refer to the exhibits to Christopher Ponzo's Sentencing Memorandum, filed at ECF No. 141. That submission is incorporated herein by reference.

year alone, for doing the same exact work that CAP Electric was doing – what the government patronizingly and misleadingly characterizes as "screwing in light bulbs." This illustration further underscores what the other evidence directly establishes: that the lucrative nature of CAP Electric's work for CLEAResult was not the result of Mr. Ponzo's criminal conduct, but a function of the program itself.

Mr. Ponzo entered the electrical contracting business specifically to take advantage of the profitability of the Mass Save program to participating electrical contractors. Taking advantage of a legal business opportunity is not a crime no matter how enormously profitable it is. To be sure, making payments to Darlington and Marra Mr. Ponzo crossed a legal and ethical line, for which he has accepted responsibility. But in order to obtain forfeiture, the government has the burden of proving that the funds they seek to forfeit are proceeds of the offense of conviction; in other words, that they would not have been obtained but for the offense. *See United States v. Cadden*, 965 F.3d 1, 37-38 (1st Cir. 2020). This is a burden the government has not met and cannot meet. Accordingly, the government's motion should be denied, and any order of forfeiture should be limited to the sum of $164,786, representing CAP Electric's net income attributable to contracts which Mr. Ponzo did not self-generate and which were assigned to CAP Electric by either Eric Darlington or Peter Marra.

## II. <u>Argument</u>

### A. The Government Has Not Met and Cannot Meet Its Burden of Proving that the $13.2 Million it Seeks to Forfeit Represents Proceeds Traceable to the Offense of Conviction.

The government seeks forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation" of certain enumerated federal criminal statutes, including

(through a cross reference) wire fraud under 18 U.S.C. § 1343. Section 981 further provides that "[i]n cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term 'proceeds' means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." 18 U.S.C. § 981(a)(2)(B). The Government bears the burden of proving by a preponderance of the evidence that the property to be forfeited "constitutes or is derived from proceeds traceable" to the offense. *United States v. Keene*, 341 F.3d 78, 86 (1st Cir. 2003); *see Malladi Drugs & Pharmaceuticals, Ltd. v. Tandy*, 552 F.3d 885, 887 (D.C. Cir. 2009).

In a bribery or kickback case, the government must prove by a preponderance of the evidence that the defendant would not have obtained the proceeds sought to be forfeited but for the payment of the bribes or kickbacks at issue. *See United States v. Lindberg*, 2020 WL 4518881, at *3 (W.D.N.C. 2020); *United States v. Percoco*, 2019 WL 1593882, at *3 (S.D.N.Y. 2019), *rev'd on other grounds*, 598 U.S. 319 (2023). Under the 'but for' standard, "funds are considered proceeds and therefore deemed forfeitable if a person would not have [the funds] *but for* the criminal offense." *United States v. Farkas*, 474 Fed. Appx. 349, 360 (4th Cir. 2012) (quotations omitted; emphasis in original). *See also United States v. Horak*, 833 F.2d 1235, 1242-43 (7th Cir. 1987) (applying 'but for' test); *United States v. DeFries*, 129 F.3d 1293, 1313 (D.C. Cir. 1997) (same); *United States v. Nicolo*, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009), *aff'd*, 421 Fed. Appx. 57 (2d Cir. 2011) (same).

In *Percoco*, the defendant's wife had been given a job in exchange for a bribe payment; the evidence showed she "would never have been hired in the first place were it not for the bribery scheme." *Percoco*, 2019 WL 1593882 at *5-6. Accordingly, all salary paid as part of the job represented proceeds traceable to the offense. *Id.* The court observed that the result

would have been different if the defendant's wife already had the job, and her salary was merely inflated as a result of the bribery scheme, in which case only the inflated amount would have constituted proceeds traceable to the offense, and subject to forfeiture. *See id.* at *6. Likewise, the court in *Lindberg* ordered funds forfeited upon a finding that the defendant "would not have obtained or acquired the identified funds . . . but for the offenses of conviction." 2020 WL 4518881, at *4.

Cases applying the forfeiture statute applicable to racketeering offenses are also instructive. Similar to Section 981(a)(1)(C), the racketeering forfeiture statute, 18 U.S.C. § 1863(a)(3), provides for the forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity." A defendant's proceeds from racketeering activity are "subject to a rule of proportionality." *United States v. Cadden*, 965 F.3d 1, 37 (1st Cir. 2020) (quoting *United States v. Angiulo*, 897 F.2d 1169, 1211 (1st Cir. 1990)). "This guardrail ensures that proceeds are subject to forfeiture only to 'the extent they are tainted by the racketeering activity.'" *United States v. Simon*, 12 F.4th 1, 66 (1st Cir. 2021) (quoting *Cadden*, 965 F.3d at 37). To adhere to this rule of proportionality, the district court in fashioning a forfeiture order "must determine the portion of [the defendant's] earnings ... over the relevant time period that were tainted by the racketeering activity and therefore subject to forfeiture." *Simon*, 12 F.4th at 66 (quoting *Cadden*, 965 F.3d at 38). Put another way, the government must show that the defendant's racketeering activities were "a cause in fact of the acquisition" of the proceeds the government seeks to forfeit. *Angiulo*, 897 F.2d at 1213.

Thus, in both *Cadden* and *Simon*, the First Circuit reversed forfeiture orders that did not apportion the defendants' earnings between those that were a product of the underlying criminal

conduct, and those that were untainted and would have been earned even in the absence of that criminal conduct. *See Cadden*, 965 F.3d at 37-38; *Simon*, 12 F.4th at 67-68. *See also United States v. Horak*, 833 F.2d 1235, 1242 (7th Cir. 1987) (remanding for determination of what portion of defendant's salaries and bonuses would not have been obtained but for unlawful activity). As the First Circuit explained in *Cadden*:

> As we have already explained, however, the District Court supportably found at sentencing that the government failed to prove that all of NECC's sales over the period in question were generated by fraud. The government likewise presents no authority for the proposition that profits from non-fraudulent sales of NECC could be considered "proceeds which [a] person obtained, directly or indirectly, from racketeering activity." 18 U.S.C. § 1963(a)(3). Given that these profits were not obtained from the racketeering activity of mail fraud that formed the basis of Cadden's convictions, but rather from legitimate, non-racketeering activity, we see no reason to adopt the government's expansive reading of the forfeiture statute.

965 F.3d at 37-38.

Here, the government has made the same error that it did in *Cadden* and *Simon*. It has sought forfeiture of *all* net income that CAP Electric made from CLEAResult jobs between 2014 and 2020, without making any showing that all of that net income resulted from the conduct underlying the offense of conviction. When properly apportioned, even viewing the evidence in the light most favorable to the government, no more than $164,786 of CAP Electric's net income from CLEAResult from 2014 to 2020, representing CAP Electric's net income in that period attributable to contracts which Mr. Ponzo did not self-generate and which were assigned to CAP Electric by either Eric Darlington or Peter Marra, is properly forfeitable from Mr. Ponzo.[3]

[3] Consistent with Supreme Court's holding in *Honeycutt v. United States*, 581 U.S. 443, 454 (2017), that forfeiture "is limited to property the defendant himself actually acquired as the result of the crime," the government seeks forfeiture from Mr. Ponzo of *only* the $13.2 million in net income which CAP Electric made from CLEAResult between 2014 and 2020, rather than the $16.8 million figure the government argued was the applicable gain for purposes of the sentencing guidelines, which included net income to Joe Ponzo's business Air Tight. In

i. Chris Ponzo Originated and Was Entitled to Receive More Than 90% of the Contracts He Worked Through CLEAResult; These Contracts Are Therefore Not Proceeds Traceable to the Offense.

Contrary to the government's attempt to shoehorn this case into the mold of a typical "money for contracts" case, the unrebutted record evidence demonstrates that Chris Ponzo self-generated more than 93% of the Mass Save jobs that CAP Electric worked through CLEAResult, and that as a matter of established CLEAResult policy, a contractor who self-generated a lead was entitled to work the resulting contract. Another approximately 5% of jobs were assigned to CAP Electric by CLEAResult employees other than Eric Darlington and Peter Marra. Measured by revenue, over 98% of the contracts which CAP Electric worked through CLEAResult are contracts which CAP Electric would have been awarded even in the absence of the payments to Darlington and Marra and thus are not proceeds traceable to the offense. *See Lindberg*, 2020 WL 4518881, at *3; *Percoco*, 2019 WL 1593882, at *3.[4] Accordingly, the government is only entitled to forfeiture of the proceeds to Chris Ponzo, net of direct costs, from the approximately 2% of contracts which Chris Ponzo did not self-generate and which were assigned to CAP Electric by Eric Darlington or Peter Marra. This comes out to $164,786.

As Chris Ponzo has attested in his Declaration filed in support of his Sentencing Memorandum, he originated and brought to CLEAResult the vast majority of the Mass Save jobs

---

addition, the government concedes (as it must) that even as to contracts which the government proves were awarded to CAP Electric as a result of the offense of conviction, CAP Electric's "direct costs" must be subtracted from the contract price to arrive at the forfeitable amount. *See* 18 U.S.C. § 981(a)(2)(B).

[4] It is undisputed that Christopher Ponzo, through the predecessor entity to CAP Electric (Electrical Associates), became an approved CLEAResult contractor in 2011, before he ever made any payment to (or agreed to pay) Eric Darlington or Peter Marra. Accordingly, the government does not argue, nor could it, that Christopher Ponzo's participation as an approved contractor in the CLEAResult Multifamily Program was a result of the offense of conviction.

which CAP Electric worked through CLEAResult. ECF No. 142 at ¶ 4 and Ex. A.[5] An expert financial analysis of all Mass Save jobs performed by CAP Electric through CLEAResult between 2014 and 2020 demonstrates that the jobs which Chris Ponzo brought to CLEAResult accounted for 93.5% of CAP Electric's revenue from CLEAResult in that period. Another 5.2% of CAP Electric's revenue from CLEAResult came from contracts assigned by a CLEAResult employee other than Darlington or Marra (none of whom the government alleges received any bribe payments from Chris Ponzo). Only 1.2% of CAP Electric's revenue from CLEAResult in that period derived from contracts assigned by Eric Darlington or Peter Marra. Applying these percentages to the $13.2 million net income figure put forth by the government, $13,035,214 of this $13.2 million represents proceeds that Chris would have been obtained even in the absence of the bribery scheme, leaving $164,786 as the only properly forfeitable amount. *See* Expert Declaration of Rebecca Greco (ECF No. 143) at ¶¶ 18-24.

Beyond the unrebutted evidence from the Declaration of Christopher Ponzo and the Expert Declaration of Rebecca Greco, other uncontested evidence in the record corroborates that it was Chris Ponzo, through his own hard work and persistence, based on relationships with property managers that he developed and cultivated, who generated virtually all of the Mass Save Multifamily program jobs which Electrical Associates/CAP Electric performed through CLEAResult. As the government's cooperating witness Peter Marra confirmed in his interview with the government "*C. Ponzo found most of his own jobs. MARRA didn't get CAP much work.*" Ex. 54 at ¶ 17. Likewise, CLEAResult's former Multifamily Program Manager Bill

[5] Ex. A to the Declaration of Christopher Ponzo identifies, by invoice number, the jobs which Chris self-generated and the few that he did not. For the jobs which he did not self-generate, Ex. A indicates whether the job was assigned to him by Darlington, Marra, or a CLEAResult field program manager other than Darlington or Marra.

Footer testified, Mr. Ponzo was "bringing in properties from two management companies [AvalonBay and Bozzuto] that were like nationwide management companies that properties in multiple states. And…some of them were like around 500 units, somewhere down to like 200 units. But all of them were over 100 units." Ex. 24 at 11-12. Chris developed an exclusive relationship with AvalonBay, who insisted that only the Ponzo brothers perform Mass Save work at their properties. *Id.* at 12. Chris Ponzo performed at least thirty-four Mass Save jobs through CLEAResult at AvalonBay properties. *See* Ex. 25. Chris developed similar relationships with and brought in hundreds of other jobs from Symes Properties, Corcoran Management, Wingate, Bozzuto, and others. *See* Ponzo Decl. (ECF No. 142). All of these customers spoke very highly of Chris and the quality of the work that his company performed, and gave him repeat business.[6] Although he was one of CLEAResult's largest generators of business, *see* Ex. 26, Mr. Ponzo was not unique in this regard.[7] According to CLEAResult, "*the vast majority of the Multifamily Residential projects are self-generated leads by participating contractors.*" Ex. 27; *see also* Ex.

[6] *See* Ex. 19 ("[I am] very impressed with the professionalism of you and your team . . . Your focus to detail, communication and customer service is greatly appreciated . . . We look forward to continuing the program at additional Avalon communities in Massachusetts"); Ex. 20 ("I would like to commend you on this project. Both of your guys are very professional, courteous, and have made this project a huge success."); Ex 21 ("Chris Ponzo has done a great job for Wingate on the LED program. I highly suggest we use him as our primary electrical vendor. His staff is professional and customer friendly."); Ex. 22 ("To date CAP has installed well over 50,000 lights and fixtures. The crews are courteous and total professional[s]. A well-organized installation program with very little disruption to the residents and staff."); Ex. 23 ("CAP has been an invaluable partner in helping us achieve [energy efficiency] goals over the last 5 years . . . From proposal generation to on-site LED retrofitting, unit sealing, and hi performance show head installs . . . Chris and his team have exceeded expectations time and against. CAP also gets rave reviews from our site teams of their professionalism, cleanliness, and any follow-up needs.").

[7] In 2017, in the middle of the indictment period, CAP Electric ranked fourth among Multifamily Program contractors in revenue generated for CLEAResult at $2,182,988. *See* Ex. 26.

28 ("In Massachusetts, most of the multi-family residential work is brought to CR by contractors.").

The unrebutted record evidence further demonstrates that it was CLEAResult's longstanding policy that a contractor who generated a customer lead was entitled to work the resulting contract. Ex. 29 at 37 ("***If a contractor brings a customer into the program, which is pretty common, we don't – we don't take work. You know, that's their customer. We wouldn't take that away.***"); Ex. 30 at p. 4 ("Mass Save HES encourages contractors (IIC & HPC) to bring your own customers into the Program" [emphasis in original]); Ex. 31 at p. 7 ("IIC [Independent Installation Contractors] may pre-qualify customers, 'tag' them, and refer them to the Mass Save Program," with "CSG return[ing] approved work scope to IIC"); Ex. 32 at 2 ("*If a contractor referred a project to CLEAResult, they would complete that project.*"); Ex. 33 (Bill Footer writing: "***[Chris Ponzo] brought the leads so he gets the work***"); *see also* Ex. 29 at 16 (Kevin Cote testifying that the customer gets to choose which contractor performs the work).

Chris admits he made payments to Darlington and Marra. But he did not make those payments in exchange for contracts. Chris did not need Darlington and Marra to give him contracts. What he did need was for Darlington and Marra to be properly incentivized to be as productive as possible in performing the energy audits and processing the contracts that Chris brought in, so that CAP Electric could actually do the work.

The government has pointed to examples of what they claim are Chris asking Darlington to provide him with contracts. In fact, as Chris has attested, *see* Ponzo Decl. ¶ 6, and as the emails themselves unmistakably demonstrate, when Chris would ask Darlington or Marra to send him contracts, all he was asking them to do was to complete the paperwork necessary to process customer contracts *that he brought in* so that he could commence the work. *See* Ex. 35; Ex. 36;

Ex. 37; Ex. 38; Ex. 39; Ex. 40; Ex. 41; Ex. 42; Ex. 43; Ex. 44; and Ex. 45. These and other emails produced in discovery show that Chris was constantly urging Darlington and Marra to stay on top of their workflow, so that he could keep his customers happy. *See id.*; Ex. 46; Ex. 47; Ex. 48; Ex. 49; and Ex. 50.[8] Marra confirmed as much in his FBI interview, explaining that he understood Chris gave him cash and gifts for "keeping the jobs straight," not for contracts; that Chris generated most of his own work; and that it was not given to him by Marra. Ex. 54 at ¶ 17.

Chris knew that Darlington and Marra were, in Marra's own words, "overworked and underpaid," Ex. 54 at ¶ 24; he knew they had received no commission or bonus or other incentive compensation based on their productivity, *see* Ex. 32 at 2; and he knew that unless he supplemented their income, they would have little incentive to put in the extra effort that was required to stay on top of the large volume of work that Chris was bringing to CLEAResult.[9] Chris also regarded paying them as a matter of fundamental fairness; he was doing well (as was obvious to Darlington and Marra), so Darlington and Marra should do well too.

ii. The Government Admits It Has Zero Evidence of Any Inflation or Manipulation of CAP Electric Contracts or Other Special Treatment.

At sentencing, the government pointed to what it contended was evidence that Darlington and Marra had inflated or otherwise manipulated certain contracts for air sealing performed by

---

[8] All of this was fully consistent with CLEAResult's corporate objectives which were to complete as many jobs and make as much money as possible. *See* Ex. 51 (Bill Footer writing: "Will you guys be submitting any more invoices this month? *Looking to pull in as much as possible*."); Ex. 52 (Footer writing: "I just need to know what I can count on you guys for the next couple months. *Under some brutal pressure here*."); and Ex. 53 (Footer writing: "Sorry guys, I just really need to know what we have nailed down for the next two months. *Our production is being reviewed on a daily basis and I can't have a big miss at the last minute*.").

[9] Darlington made around $62,000, while Marra made around $78,000. Neither received any form of incentive compensation from CLEAResult. *See* Ex. 32 at 2.

Joe Ponzo's company, Air Tight. *See* Gov't Sentencing Memo. (ECF No. 140) at pp. 10-11; 17-18. Chris Ponzo disputes that contention, as explained in his sentencing memorandum. *See* ECF No. 141 at 10-12. However, for purposes of forfeiture, the government is only seeking to forfeit amounts which were paid to CAP Electric for work it performed – not amounts paid to Air Tight; accordingly, whether there was manipulation of Air Tight contracts or not is irrelevant. There is absolutely no evidence that CAP Electric contracts were manipulated, as the government admits. *See* Gov't Sentencing Memo. (ECF No. 140) at pp. 19-20 (acknowledging absence of evidence but insisting "*[i]t is likely* that similar contract adjustments were being made for CAP Electric"). To the contrary, the undisputed evidence shows CAP Electric was paid set, non-negotiable prices per installed lighting fixture, which were established by contract between CLEAResult and the participating utilities. Ex. 57 at USAO_NG_00000415-419; Ex. 58 at USAO-0041612-41615.

Moreover, the government has no evidence that CAP Electric did not perform the work they were contracted and paid to do, nor can they even point to any issues with the quality of CAP Electric's work, save for a single instance of uninstalled lightbulbs. The government points to an isolated incident in which an employee of Eversource, Marge Kelly, performed an unannounced "spot check" of a property in the Seaport and discovered there a pallet of lightbulbs which CAP Electric allegedly failed to install.[10] The government's reliance on this single, minor, supposed incident underscores the complete absence of evidence that CAP Electric did

[10] Ms. Kelly's interviews with the government and grand jury testimony makes clear that she had an axe to grind with CLEAResult. She described CLEAResult's program manager for the Multifamily Program (and her primary contact at CLEAResult), Bill Footer, as "lazy" and "asleep behind the wheel for years," and complained that he "gave too much freedom to the Field Property Managers such as Darlington," "did not take Kelly, or her input, seriously," and "pushed back on process improvements" recommended by Kelly. Ex. 59 at 3-4. She criticized Darlington too, saying that his work was "unsatisfactory" and that he "often took shortcuts." *Id.* at 3. When Footer did not respond to her concerns about Darlington in the way she wanted, she went over Footer's head to one of the top bosses at CLEAResult, Bob Eckel. *Id.*

not do exactly what it was paid to do, much less that any substandard work was somehow a systemic byproduct of a criminal conspiracy. Indeed, following the discovery of the pallet of lightbulbs, a review of CAP's other jobs was performed (including by a third-party audit company) and no discrepancies or issues were identified. Ex. 59 at 5; Ex. 56 at 37. Kelly herself could not recall observing any other issues with work performed by CAP. Ex. 56 at 36. Indeed, like all CLEAResult contractors, CAP's jobs were regularly and randomly audited by a third-party inspection company, CMC, employed by the utilities, with nothing out of the ordinary found.

iii. Mr. Ponzo Did Not Admit to Obtaining $36 Million in Revenue or $13.2 Million in Net Income as a Result of the Offense of Conviction.

Contrary to the government's contention, Chris has never admitted that the monies he received from CLEAResult resulted from the payments he made to Darlington and Marra. To be clear, Chris concedes that there were a small number of contracts, representing less than 2% of CAP Electric's revenue from CLEAResult in the period 2014-2020, which he did not originate and which were assigned to him by Darlington or Marra. For purposes of this forfeiture proceeding, Chris does not dispute that net income derived from these contracts – totaling $164,786 – is forfeitable by the government. However, he certainly never admitted, as the government falsely contends, that his company "obtained approximately $36 million in connection with the offense of conviction," nor did he concede any other facts which would establish the nexus the government must show to forfeit CAP's net income on this revenue. The statement which the government relies upon that Mr. Ponzo did not challenge at his Rule 11 hearing was simply that "[f]rom 2013 to 2022, CAP Electric and Electrical Associates received approximately $36 million in payments from CLEAResult." ECF No. 133, Transcript of

November 6, 2024 Rule 11 Hearing, at 14:15-17.[11] The government's contention that Mr. Ponzo somehow admitted to the requisite nexus between these payments and the offense of conviction is particularly disingenuous given that Mr. Ponzo's counsel, before the Rule 11 hearing, made quite clear to counsel for the government that Mr. Ponzo would not agree to any recitation of the facts that asserted or suggested that he received $36 million in contracts in exchange for his payments to Darlington and Marra. It was this conversation that presumably led Mr. Chao to inform the Court at the conclusion of the Rule 11 hearing that "*I believe loss amount will be very heavily litigated by the parties in this case*[.]" *Id.* at 30:2-9. Certainly, the government did not believe following the Rule 11 hearing that Mr. Ponzo had made any admission regarding loss, gain, or forfeiture.

### B. Forfeiture in the Amount of $13.2 Million Would Violate the Excessive Fines Clause of the Eighth Amendment.

In *United States v. Bajakajian*, 524 U.S. 321, 334 (1998), the Supreme Court held that the Excessive Fines Clause of the Eighth Amendment applies to forfeiture and that forfeiture violates that clause "if it is grossly disproportional to the gravity of a defendant's offense." The First Circuit first applied the principle in *United States v. Heldeman*, 402 F.3d 220 (2005), extracting from the *Bajakajian* discussion a set of factors to be considered in determining what is gross disproportionality:

---

[11] Chris also did not dispute the government's statement at the Rule 11 hearing that in exchange for payments he made to Darlington and Marra, they "assisted CAP Electric and Air Tight in obtaining CLEAResult Mass Save projects." ECF No. 133, Transcript of November 6, 2024 Rule 11 Hearing, at 16:11-13. Given that it was Darlington's and Marra's job to process contracts for jobs that Chris originated, and given that 2% of the CAP Electric's contracts were contracts which Chris did not originate and which were assigned to him by Darlington or Marra, Chris did not dispute this statement. His failure to do so is far from an admission that all $36 million worth of contracts which CAP Electric performed through CLEAResult were awarded to CAP in exchange for bribes.

> (1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant.

*Id.* at 223.[12]

All of these factors support the conclusion that forfeiture of $13.2 million in this case is wildly disproportionate.

i. <u>The Defendant Does Not Fall into the Class of Persons at Whom the Criminal Statute Was Principally Directed.</u>

This factor is drawn from the *Bajakajian* court's focus on comparing the main purpose of the statutory offense to the particular criminal conduct at issue. The defendant there had pled guilty to carrying and concealing over $350,000 in cash on an international flight without reporting it to customs as required by law. 524 U.S. at 324-25. The applicable statute required him to forfeit the entire amount. *Id.* at 325. The Court concluded, however, that the full forfeiture called for by the statute would be excessive, finding as a key factor the fact that the violation "was unrelated to any other illegal activities. . . . [but rather] was the proceeds of legal activity and was to be used to repay a lawful debt." *Id.* at 337-38. Thus, the Court found, the "respondent [did] not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader." *Id.* at 338. In other words, while the defendant had committed a clear violation of the statute – carrying and concealing unreported cash – the *main* purpose was to punish persons who had committed the offense in

[12] In *United States v. Levesque*, 546 F.3d 78, 83 (1st Cir. 2008), the First Circuit added a separate, fourth factor which could be considered if the analysis of the other three factors produced no relief: whether a forfeiture is "so onerous as to deprive a defendant of his or future ability to earn a living."

order to facilitate other serious crimes; not those who did so to further an otherwise absolutely innocent project. *See id.*

This feature applies to the Defendant here, whose purpose in giving money and gifts to Darlington and Marra was not to facilitate any illegal activities but to motivate them in performing their entirely legitimate jobs. Unlike cases where the defendant stole from a victim, or sold illegal substances or guns, Mr. Ponzo's aim here was to promote a legal enterprise and was designed to enrich the "victim" as well as himself. The point in giving money and gifts to Darlington and Marra was to incentivize them to work harder doing precisely what their jobs entailed, thus enabling Mr. Ponzo to expand the customer base of the Mass Save program – all to the advantage not only of himself but of CLEAResult and the utilities as well. And that is exactly what happened. CLEAResult earned a significant commission on every single job that Mr. Ponzo brought to the company, to the tune of millions of dollars. Moreover, the energy savings generated by the work was credited to the utilities to trade for profit in the market. *Contrast United States v. Jose*, 499 F.3d 105, 112 (1st Cir. 2007) (forfeiture not excessive where a statute which prohibited "bulk cash smuggling" was specifically and only designed to cover the precise conduct that the defendant committed, where the record "raise[d] serious suspicions about whether the funds were legally derived," and the defendant, who had the burden of proof, had produced no evidence to the contrary.)

ii. <u>Penalties Authorized by the Legislature and the Sentencing Commission Do Not Support the Requested Forfeiture.</u>

Another factor flagged by the *Bajakajian* court was the principle that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature[,]" and, therefore, "'[r]eviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes.'"

524 U.S. at 336 (quoting *Solem v. Helm*, 463 U.S. 277, 290) (1983)). In *Bajakajian*, the Court was impressed by the fact that the forfeiture was larger than the $5000 maximum fine under the guidelines "by many orders of magnitude, and it bears no articulable correlation to any injury suffered by the government." *Id.* at 240. In fact, it was 70 times more. *See id.*

In *United States v. Beras*, 183 F.3d 22 (1st. Cir. 1999), the Court faced a case much like *Bajakajian* in which the defendant, having been convicted of failing to report $138,794 in cash, was ordered by the district court to forfeiture the full amount. Recognizing that "there is no doubt that the forfeiture order" was excessive, the First Circuit remanded to the district court to "set[] a forfeiture order that is not grossly disproportional to the gravity of [defendant's] offense." *Id.* at 29. In doing so, the Court endorsed the passage in *Bajakajian* which indicated "that the maximum penalties provided under the Guidelines should be given greater weight than the statute because the Guidelines take into consideration the culpability of the individual defendant." *Beras*, 183 F.3d at 29 n.5 (citing *Bajakajian*, 524 U.S. at 339 n.14). The Court also approved of a Ninth Circuit case which followed the same principle, *United States v. 3814 NW Thurman St.*, 164 F.3d 1191, 1197 (9th Cir. 1999) (remanding to reduce a $200,000 forfeiture where the statutory maximum authorized a $1 million fine but the guideline called for no more than $5,000, thus "confirm[ing] a minimal level of culpability").

In *United States v. Rafael*, 282 F. Supp. 3d 407, 413 (D. Mass. 2017), Judge Young, rejecting a government argument that he should impose a forfeiture based upon the aggregate of maximum statutory fines for 23 counts, instead followed the *Bajakajian* and *Beras* analysis, and determined that some multiple of the applicable guideline maximum – $200,000 in that case – should be the measure. After a review of other decisions, he concluded that the "limit of

constitutional proportionality" there would be "approximately ten times the maximum guidelines fine, and probably a bit more" -- thus arriving at a forfeiture of $2 million. *Id.*

In this case the maximum guidelines fine – based upon a total offense level of 14 – is $75,000. Thus, even if the imposed forfeiture amount of $13.2 million were supportable under 18 U.S.C. 981 and the decisional law (which it surely is not, for the reasons explained above), *the forfeiture would be nearly 176 times the maximum guidelines fine.*

iii. <u>The Harm Caused by the Defendant Does Not Support the Forfeiture Imposed.</u>

Forfeiture of $13.2 million is grossly disproportionate here where the offense not only caused no economic loss but actually generated millions of dollars of gain to the victim. Chris Ponzo caused no pecuniary harm to CLEAResult or to the utilities. As explained at length in Mr. Ponzo's sentencing memorandum, the government's argument that there was a loss which resulted from Mr. Ponzo's offense is based almost exclusively on what it contends was "overbilling" by Air Tight (not CAP Electric). Moreover, there is no merit to the government's "overbilling" theory at all, which, as Probation agreed in the Presentence Report, is flatly contradicted by the actual evidence that Air Tight billed in accordance with established CLEAResult policies, and at standard rates which were agreed to as a matter of contract between CLEAResult and the participating utilities.

Nor does the late-filed "Victim Impact Statement" filed by the government on behalf of CLEAResult – an eleventh hour attempt to provide some proof of harm – demonstrate any cognizable injury. Harm to reputation and the cost of attorney's fees are not cognizable harms for purposes of sentencing. *See* USSG § 2B1.1(b)(1), Note C to Table ("pecuniary harm does not include emotional distress, harm to reputation or other non-economic harm"); and Commentary, Note 3(C) (providing that "costs incurred by victims primarily to aid the

government in the prosecution and criminal investigation of an offense" are excluded from loss under 2B1.1). In addition, the $398,755.23 that CLEAResult claims it could not recover from the utilities following the Ponzo brothers' arrest is not a cognizable harm to CLEAResult, because CAP Electric was never paid by CLEAResult for those jobs. Following Chris Ponzo's arrest, CLEAResult stiffed CAP Electric out of hundreds of thousands of dollars which it owed CAP for jobs that CAP had performed but not yet been paid for. Had CLEAResult been paid by the utilities for those jobs and failed to remit those funds to CAP Electric, that would have produced a windfall gain to CLEAResult.

Finally, the assertion in CLEAResult's Victim Impact Statement that it lost out on future Mass Save utility business because of the Ponzo brothers' well-publicized indictment is wildly speculative, devoid of any proof, totally lacking in any substantiation for the claimed amounts. The restitution statute, 18 U.S.C. § 3663A, sets limits on the scope of cognizable losses that may be restored via restitution. Restitution may be ordered only to any "person directly and proximately harmed as a result of the commission of the offense for which restitution may be ordered." *Id.* at 3663A(a)(2). "[R]estitution should not be ordered if the loss would have occurred regardless of the defendant's misconduct underlying the offense of conviction" or "if the conduct underlying the conviction is too far removed, either factually or temporally, from the loss." *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002). "This means, in effect, that the government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." *Id.* (quoting *United States v. Vaknin*, 112 F.3d 579, 589 (1st Cir. 1997)). "This standard reflects the Supreme Court's pronouncement that restitution awards are limited to 'the loss caused by the specific conduct that

is the basis of the offense of conviction.'" *Cutter*, 313 F.2d at 7 (quoting *Hughey v. United States*, 495 U.S. 411, 413 (1990)).

Here, there has been absolutely no showing that CLEAResult lost out on any contracts or the value of any such loss, much less that any such loss was proximately caused by the conduct for which the Ponzo brothers are convicted. Eversource in particular had been dissatisfied with CLEAResult for years, for reasons completely unrelated to the Ponzo brothers.[13] The utilities put their Mass Save contracts out to bid on a semi-annual basis, and there could have been any number of reasons why the utilities elected not to renew with CLEAResult or renewed at a lesser value. While CLEAResult's statement claims that it was because of the indictment in this case that CLEAResult's contract negotiations with the utilities were "put on hold" and that the value of the contract was subsequently reduced, the negotiation emails and the supposedly impacted contract which were attached to it letter all *pre-date* the April 28, 2022 original indictment in this case. The claim, dubious as it is, is therefore shown to be false on its face.

## III. <u>Conclusion</u>

For all the reasons set forth above, Mr. Ponzo respectfully requests that the Court deny the government's motion seeking forfeiture in the amount of $13.2 million, and that any order of forfeiture be limited to the sum of $164,786, representing CAP Electric's net income attributable to contracts which Mr. Ponzo did not self-generate and which were assigned to CAP Electric by either Eric Darlington or Peter Marra.

---

[13] Eversource's point person for the Mass Save Program, Marge Kelly, described her primary contact at CLEAResult, Multifamily Program manager Bill Footer, as "lazy" and "asleep behind the wheel for years," and complained that he "gave too much freedom to the Field Property Managers," "did not take Kelly, or her input, seriously," and "pushed back on process improvements" recommended by Kelly. *See* ECF No. 141-59 at 3-4.

Respectfully submitted,

CHRISTOPHER PONZO,

By his attorneys,

*/s/ Max D. Stern*
Max D. Stern, BBO # 479560
Howard M. Cooper, BBO # 543842
Christian Kiely, BBO # 684308
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
mdstern@toddweld.com
hcooper@toddweld.com
ckiely@toddweld.com
617-720-2626

Dated: February 19, 2025

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Christian G. Kiely*
Christian G. Kiely

Dated: February 19, 2025