# United States Court of Appeals
## <u>For the First Circuit</u>

Nos. 25-1203
     25-1259
     25-1327

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTOPHER PONZO; JOSEPH PONZO,

Defendants, Appellants.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, <u>U.S. District Judge</u>]

———————————

Before
Gelpí, Thompson, and Montecalvo,
<u>Circuit Judges</u>.

———————————

<u>Christian G. Kiely</u>, with whom <u>Max D. Stern</u> and <u>Todd & Weld LLP</u> were on brief, for appellant Christopher Ponzo.
<u>Michael J. Connolly</u>, with whom <u>Elizabeth R. Farrenkopf</u> and <u>Hinckley, Allen & Snyder, LLP</u> were on brief, for appellant Joseph Ponzo.
<u>Lauren Maynard</u>, Assistant United States Attorney, with whom <u>Leah B. Foley</u>, United States Attorney, was on brief, for appellee.

———————————

April 1, 2026

———————————

**THOMPSON**, <u>Circuit Judge</u>.

### OPENING

Meet the Ponzo brothers, Chris and Joe (we use first names — as their briefs sometimes do — not out of disrespect but for clarity).  A while back they pled guilty (without plea agreements) to felonies arising from a bribery scheme involving "Mass Save," a state-mandated program (funded by surcharges on utility bills) that supports energy-conservation projects.[1]  The copped-to charges covered (for both brothers) conspiracy and substantive honest-services wire fraud, lying to federal agents, and (for Joe only) aiding and assisting false tax returns.  <u>See</u> <u>respectively</u> 18 U.S.C. § 1349, §§ 1343 and 1346, and § 1001(a)(2) and 26 U.S.C. § 7206(2).  A district judge then sentenced them each to 27 months in prison (an above-guidelines term for Chris but a within-guidelines stint for Joe), and ordered Chris to forfeit $13.2 million and Joe to forfeit $3.6 million.

How the Ponzos became crooks and what they want from us is kind of a long story.  But here's the short version (with more to come soon).

---

[1] As is our practice in guilty-plea appeals, we take the facts from the operative indictment, the uncontested parts of the presentence reports, the transcripts of key court hearings, and the sentencing record.  <u>See, e.g.</u>, <u>United States</u> v. <u>Diaz-Serrano</u>, 77 F.4th 41, 44 (1st Cir. 2023).

Chris owned CAP Electric, Inc., a business specializing in energy-conservation work. In 2013 he began bribing people at CLEAResult, a firm that picked and oversaw contractors on Mass Save projects. He later pulled Joe into the scheme, with Chris and CLEAResult employee Eric Darlington helping Joe (and his wife) set up an air-sealing company called Air Tight Solutions, LLC as a Mass Save contractor (air-sealing — as its name suggests — blocks air, making buildings less drafty). Doing next to no work for the company (and without telling CLEAResult), Joe subcontracted the air-sealing projects to Chinasa Construction Services, Inc. and falsely claimed Chinasa employees were Air Tight employees — the Ponzos even created fake email addresses for the Chinasa staffers to make it look like they worked at Air Tight.[2] To cover his share of the payola, Joe sent money from Air Tight to Chris and CAP Electric and labeled it "subcontractor" business expenses. Chris then bought off CLEAResult employees. From 2013 to 2017, for example, he gave Darlington $1,000 cash every week and bought him expensive things like an Apple MacBook, a John Deere tractor, bathroom fixtures, and outdoor lights. And after CLEAResult fired Darlington in 2017, the brothers began bribing

---

[2] A brief word about the Chinasa-employees/email stuff. The government put all that front and center in its brief, piecing together info from several sentencing exhibits, with no rebuttal from the Ponzos in their reply briefs.

CLEAResult employee Peter Marra — sending him cash and gift cards for special favors like getting heads-ups on inspections and audits.  All told, CAP Electric took in about $36 million from CLEAResult and Air Tight received about $7.4 million.

Life was good for the millionaire brothers.  But the government eventually caught on.  And arrests, indictments, guilty pleas, sentencings, and forfeitures followed.  Which brings us to today's appeals, where the Ponzos attack the sentences and the forfeitures from many angles.  Read on to see why we affirm across the board (credit where credit is due — our basic analysis tracks that of the government).

**SENTENCES**

Broadly speaking, the Ponzos argue (either individually or collectively) that the judge procedurally erred — first by miscalculating the tax loss attributable to Joe in setting the base-offense level for his tax crimes, then by misapplying guidelines enhancements to their sentences, and finally by

misstating how much money they made from their misdoings.[3]   But none of their arguments work.[4]

### Base-Offense Level

Joe claims that the judge plainly erred by accepting the presentence report's calculation of the tax loss at $115,528.[5] Because $115,528 is more than $100,000 but less than $250,000, the judge then set the base-offense level at 16 per the tax table at USSG § 2T4.1.   Joe thinks that the government misled the judge by saying in its sentencing memo that he "and his wife purchased almost $300,000 in gift cards . . . to disguise their personal purchases as deductible business expenses" — misled, because (according to Joe) the exhibit mentioned in the memo "included

---

[3] A defendant can ask us to review a sentence's procedural reasonableness, substantive reasonableness, or both.  See, e.g., United States v. Denson, 689 F.3d 21, 26 (1st Cir. 2012). Procedural reasonableness focuses on *how* the judge arrived at the sentence (for example, whether the judge improperly calculated the sentencing range, relied on clearly erroneous facts, or inadequately explained the sentence).  See, e.g., Gall v. United States, 552 U.S. 38, 51 (2007).  Substantive reasonableness focuses on the sentence's *length* (whether the judge was too harsh or too lenient, for instance).  See, e.g., United States v. Rivera-Berríos, 902 F.3d 20, 26 (1st Cir. 2018).

[4] The brothers' briefs could be read as faulting the judge for not following probation's "conclusions."  If so, we give that claim no never mind because the judge wasn't bound by probation's conclusions.  See United States v. Robinson, 433 F.3d 31, 36 (1st Cir. 2005).

[5] The judge used the 2024 edition of the sentencing guidelines (which is also the edition we use in this appeal).  See United States v. Yoon, 167 F.4th 556, 564 (1st Cir. 2026); United States v. Mehanna, 735 F.3d 32, 67-68 (1st Cir. 2013).

only $118,919.83 worth of gift card purchases" and so "supports a tax loss amount of no more than $47,092.25," generating a base-offense level of 14.

Assuming Joe forfeited the argument (as he implies) rather than waived it (as the government insists), we hold that he hasn't shown plain error — an exacting standard that requires him to prove not just an error but an obvious error that affected both his substantial rights and the fairness of the sentencing process. See, e.g., United States v. Fargas-Reyes, 125 F.4th 264, 270 (1st Cir. 2025).  We say that because the $115,528 tax loss is an "IRS calculated" number (per the presentence report), a number Joe didn't "refute" with "any information" (per probation) below or here.[6]  If anything, the judge-accepted tax loss *undervalued* the true amount because it included only gift-card purchases, not other purchases Joe made using Air Tight accounts (like synthetic turf he bought for *his* house) — a point the government made in its brief without correction from Joe in his reply brief.

### Enhancements

The brothers (sometimes together, sometimes separately) object to the judge's use of sentencing enhancements for

---

[6] The government's sentencing memo excerpted lines from an IRS report explaining the  "$296,084.25" in gift-card purchases and $9,542.60 in gift-card activation fees.

sophisticated means under USSG § 2B1.1(b)(10)(C) (Chris and Joe) and USSG § 2T1.4(b)(2) (Joe); obstruction of justice under USSG § 3C1.1 (Chris and Joe); and aggravating role under USSG § 3B1.1(c) (Chris).[7]   They also insist that the judge didn't adequately explain the findings supporting these enhancements.   All agree — or at least don't dispute (and we have no reason to doubt) — that the brothers preserved these enhancements below.  So we review for abuse of discretion, reversing *only if* the brothers show a legal error, a clearly erroneous factual finding, or an obvious error of judgment.  See, e.g., United States v. Reyes-Torres, 979 F.3d 1, 7 (1st Cir. 2020); United States v. Leahy, 668 F.3d 18, 21 (1st Cir. 2012).  See generally United States v. Rodriguez, 115 F.4th 24, 49 (1st Cir. 2024) (recognizing that "[t]he government bears the burden of proving any sentencing enhancement by a preponderance of the evidence").

### *Sophisticated Means*

The Ponzos first dispute the 5-level sophisticated-means enhancements under USSG § 2B1.1(b)(10)(C).[8]   This enhancement

---

[7] This will all become much clearer shortly.

[8] That provision provides for a 2-level enhancement for sophisticated means — unless "the resulting offense level is less than level 12," in which case it calls for an "increase to level 12."  USSG § 2B1.1(b)(10)(C) (bolding omitted).  And because the judge initially set the Ponzos' base offense levels at 7, he then hit them with a 5-level enhancement to put them at level 12.

applies to "especially complex" or "especially intricate" efforts to commit or conceal a crime.  USSG § 2B1.1 cmt. n.9(B).  "[H]iding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts" are examples of what "ordinarily" constitutes "sophisticated means." Id.  This list isn't "exhaustive."  United States v. Foley, 783 F.3d 7, 25 (1st Cir. 2015).  And "'the enhancement properly applies to conduct less sophisticated' than the examples" given.  Id. (quoting United States v. Jennings, 711 F.3d 1144, 1147 (9th Cir. 2013)).

Arguing in unison, the brothers claim that the judge could apply the enhancement *only* if Air Tight was a "shell company" with no business operations or assets — something they say Air Tight *wasn't* because it "was engaged in the business of performing air sealing work under contract with CLEAResult."  But the shell-company example listed above is just that — an *example*.  Which the brothers wrongly portray as dispositive.  Anyway, the two formed Air Tight — creating phony email accounts, falsifying employees, using the enterprise to funnel bribe money to Chris, wrongly classifying those payments as business expenses, *etc.* — to make the "scheme more effective and difficult to thwart."  See Foley, 783 F.3d at 26 (quoting United States v. Evano, 553 F.3d 109, 113 (1st Cir. 2009)).  And those elaborate steps attest to

- 8 -

sophisticated means.  See id. (holding that the defendant's use of "fraudulent" documents, "fictitious down payments," and "fake checks," taken together, constituted sophisticated means); see also Evano, 553 F.3d at 113 (stressing that a "scheme may be sophisticated even if the individual elements taken alone are not").

Joe also attacks the 2-level sophisticated-means enhancement under USSG § 2T1.4(b)(2).  As before, "sophisticat[ion]" signifies "especially complex" or "especially intricate" efforts to commit or conceal tax fraud.  USSG § 2T1.4 cmt. n.3.  This includes, just as before, conduct like "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."  Id.

Joe sees "nothing sophisticated about the ways in which [he] reported personal expenses as business expenses." But viewing the scheme in its entirety, we see his multi-part effort of using Air Tight accounts to buy *hundreds of thousands* of dollars' worth of gift cards from stores, then using them to make *personal* purchases, and then reporting those outlays as *business*-expense deductions on his tax returns.  Ultimately, this conduct (which lowered his tax liability while also making it seem like Air Tight was a legit business incurring regular business expenses) suffices to sustain the enhancement — a point the government made in its

brief with no comeback from Joe in his reply brief.  See generally United States v. Thorndike, 563 F. App'x 71, 74 (2d Cir. 2014) (summary order) (observing that while it's possible that "each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together" (quoting United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003))).

### *Aggravating Role*

Chris questions the 2-level aggravating-role enhancement under USSG § 3B1.1(c).  A defendant qualifies for that adjustment if "the criminal activity involved at least two, but fewer than five, complicit individuals (the defendant included)" *and* that "in committing the offense, the defendant exercised control over, managed, organized, or superintended the activities of at least one other participant."  United States v. Ilarraza, 963 F.3d 1, 13 (1st Cir. 2020) (quoting United States v. Al-Rikabi, 606 F.3d 11, 14 (1st Cir. 2010)).  The supporting evidence "may be wholly circumstantial, and need only show that he exercised authority or control over [one other] participant on one occasion."  United States v. Grullon, 996 F.3d 21, 34-35 (1st Cir. 2021) (alteration in original) (quoting United States v. Cortés-Cabán, 691 F.3d 1, 28 (1st Cir. 2012)).  See generally USSG § 3B1.1 cmt. n.4 (explaining that factors for applying the enhancement include the

- 10 -

defendant's decision-making authority, the nature of his participation, his control over others, his role in recruitment and planning, the scope of his illegal endeavor, and his share of the crime's fruits).

Insisting, for instance, that he never "commanded" Darlington or Marra "to produce customers," Chris protests that "*no* evidence" showed that he "'exercised authority or control' over his co-conspirators" (emphasis added). Not so, we say. Consider just two record-supported examples that the government highlighted below. Chris told Joe to create fake emails for Chinasa employees. And Joe did. Chris also told Joe to send money to CAP Electric to cover bribes. And Joe did. The government spotlighted these enhancement-supporting examples in its brief without any contradiction from Chris in his reply brief. On top of all this, it's not lost on us that Chris recruited Joe into the scheme in the first place. See United States v. Savarese, 686 F.3d 1, 20 (1st Cir. 2012) (reiterating that recruitment, "by itself, constitutes a 'managerial function' under" § 3B1.1, and that recruitment is about "the demonstration of individual authority necessary to bring a new member into the fold" (quoting United States v. Joyce, 70 F.3d 679, 682 (1st Cir. 1995))).

***Obstruction of Justice***

The brothers next contest the 2-level enhancements for obstruction of justice under USSG § 3C1.1. That section applies if a "defendant willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction."

The judge hit Chris with this enhancement for three independent reasons: (*1*) Because Chris stands convicted under § 1001 for lying to federal agents, the enhancement automatically applied. (*2*) Chris's lies impeded the investigation. And (*3*) Chris tried to get co-conspirator Darlington to lie. The record indicates that the judge thought that independent reasons (*1*) and (*2*) also supported the enhancement against Joe (*i.e.*, Joe stands convicted under § 1001 for lying to federal agents, and Joe's lies impeded the investigation) — as Joe and the government agree. But Chris's and Joe's lead briefs *only* challenge independent reason (*2*) (the "lies impeded the investigation" reason), *not* the others. Which won't secure reversal on this issue. See Oliveras-Villafañe v. Baxter Healthcare SA, 140 F.4th 29, 33 (1st Cir. 2025) (holding that we can "affirm the district court's decision on an independent ground that Appellants have left unchallenged"); see also Miller v. Jackson, 152 F.4th 258,

271 (1st Cir. 2025); <u>United States</u> v. <u>Henry</u>, 848 F.3d 1, 7 (1st Cir. 2017).[9]

### *Explanation*

The Ponzos then complain that the judge didn't sufficiently explain the enhancement-supporting findings. Neither Chris nor Joe made this claim below, however — despite having chances to do so. See generally <u>Puckett</u> v. <u>United States</u>, 556 U.S. 129, 134 (2009) (noting that timely objections allow district courts to fix any possible errors as they arise). Which requires

---

[9] Joe may think that a sentence in his opening brief — that <u>Isabel</u> v. <u>United States</u>, 980 F.2d 60, 61 (1st Cir. 1992), holds "the enhancement . . . does not apply unless the false statement 'significantly obstructed or impeded the official investigation or prosecution of the instant offense'" — constitutes engagement with reason (*1*). We see this as a possibility because he believes <u>Isabel</u> "establishe[s] . . . that a conviction for obstructive conduct *alone* is insufficient to warrant" the adjustment. An application note to the guidelines states that "making false statements, not under oath, to law enforcement officers," unless such statements "significantly obstructed or impeded the official investigation," "ordinarily" (notice the adverb) won't merit the enhancement. See USSG § 3C1.1 cmt. n.5(B) (first quote); <u>id.</u> § 3C1.1 cmt. n.4(G) (second quote); <u>id.</u> § 3C1.1 cmt. n.5 (third quote). But there's a caveat: "if the defendant *is convicted* of a separate count for such conduct" — like Chris and Joe were — then the "adjustment *will apply*." See <u>id.</u> § 3C1.1 cmt. n.5 (emphases added). And nothing in <u>Isabel</u> addresses — let alone bars — the caveat's application here. See generally <u>United States</u> v. <u>Figueroa</u>, No. 24-1008, 2025 WL 289426, at *3 (2d Cir. Jan. 24, 2025) (summary order) (holding that a conviction "for making false statements to federal law enforcement agents" "mandated" the obstruction enhancement's "imposition"); see also generally <u>United States</u> v. <u>Ricardson</u>, 732 F. App'x 822, 829-30 (11th Cir. 2018) (per curiam) (similar); <u>United States</u> v. <u>Davist</u>, 481 F.3d 425, 427 (6th Cir. 2007) (similar).

them to show plain error.  See, e.g., United States v. Reda, 787 F.3d 625, 630-31 (1st Cir. 2015).  But they don't even try to satisfy that tough test, thus waiving the issue.  See, e.g., United States v. Cruz-Ramos, 987 F.3d 27, 40 (1st Cir. 2021); United States v. Rivera-Carrasquillo, 933 F.3d 33, 49 n.15 (1st Cir. 2019).

Even setting waiver aside — and there's *no* need to — we see no obvious error with the judge's explanations.  The parties fought over the enhancements in their sentencing memos.  The judge read them.  Chris and the government continued the fight at his sentencing.  And the judge "agree[d] with the government['s]" take.  Plus the judge at Joe's later-held sentencing "accept[ed]" the government's "recommendation" about "the enhancements" that Joe "vigorously contested."  All this is very important because controlling precedent lets us infer the judge's reasoning from what the parties argued.  See, e.g., United States v. D'Angelo, 110 F.4th 42, 49 (1st Cir. 2024); Ilarraza, 963 F.3d at 12; United States v. Zehrung, 714 F.3d 628, 631 (1st Cir. 2013).  Which is precisely what we do here.

### Money Made

Chris argues that the judge imposed the above-guidelines sentence based on a mistaken belief that he had made "multimillions" from the scheme, "apparently somewhere around

[$]13 million" (he pulled that quote from the judge's sentencing analysis).  Contending that "this was not supported by any evidence," he claims the "sentencing record establishe[s]" that he "generated virtually all of the Mass Save jobs which CAP Electric performed through CLEAResult."[10]  Darlington or Marra, he continues, "assigned" him "only 1.2% of [the] jobs," leading to "$164,786 in net income" for him (Chris) — *not* multimillions.

Sounding a similar theme, Joe argues that the judge picked the within-guidelines sentence based on an incorrect view that he made "in the neighborhood of $10 million" (a number, he notes, that's different from the $3.6 million figure the judge ordered him to forfeit).  To his mind, the $10 million number is off because almost all "of Air Tights' revenue during this period was attributable to contracts originated by" Chris and not from the bribes.  And, he writes, based on the contracts assigned by Darlington or Marra, "the amount of tainted proceeds is limited to approximately $151,800."[11]

---

[10] By "generate" Chris means he "br[ought] in the potential customer."  And "[h]ow did Chris generate this work," counsel rhetorically asked the judge at sentencing.  "He knocked on doors and he made cold calls selling property managers on [the] benefits of the Mass Save program.  He was persistent and he got people to listen."

[11] We can assume without deciding that the Ponzos are right that Chris "f[ou]nd[] and recruit[ed] virtually all of the customers."

The government claims that Chris must run the plain-error gauntlet because he didn't "object when the [judge] stated the finding he now claims" lacked evidentiary support.  We agree. While Chris thinks that his sentencing memo said enough to preserve this procedural-reasonableness argument, he didn't "object to the alleged error when it occurred at the sentencing hearing."  See United States v. Rivera-Rivera, 146 F.4th 59, 88 (1st Cir. 2025). Which means plain-error review applies.  See id.  But by not attempting to show plain error, "he has waived our review of this claim."  See id.[12]

As for Joe, he concedes that the plain-error standard governs.  But he's still out of luck.  Echoing Chris's argument, his theory rises or falls with the idea that it matters whether

---

[12] Quoting Holguin-Hernandez v. United States (but adding alterations), Chris's reply brief argues that plain error does not apply because "where a criminal defendant advocates for a sentence shorter than the one ultimately imposed . . . [n]othing more is needed to preserve the claim that a longer sentence is unreasonable."  See 589 U.S. 169, 173-74 (2020).  Holguin-Hernandez held that a defendant who argues for a particular sentence "communicates to the trial judge his view that a longer sentence is 'greater than necessary'" and so preserves a *substantive*-reasonableness claim.  See id. at 174-75.  Chris, however, makes a *procedural*-reasonableness claim involving a (supposedly) "clearly erroneous" finding — something he stressed in his lead brief (he quoted Gall's point that a sentence based on "clearly erroneous facts" is *procedurally* unreasonable).  See id. at 767 (clarifying that the Court wasn't deciding "what is sufficient to preserve a claim that a trial court used improper *procedures* in arriving at its chosen sentence").  So Rivera-Rivera controls the preservation issue before us.

Chris "generated" nearly all the contracts.  It doesn't, at least not on this record.

But don't just take our word for it — take Chris's and Joe's.  They admitted key facts at their guilty-plea hearing.  Like how Darlington and Marra "participated in the recommendation, the selection, and [the] oversight of contractors" — including the Ponzos.  Like how Darlington helped Air Tight become an approved CLEAResult contractor, a necessary step for Air Tight to get money from CLEAResult.  Like how Darlington and Marra helped CAP Electric and Air Tight "with pricing, billing, invoicing and receiving payments from CLEAResult."  And like how Marra gave the Ponzos other "preferential treatment" in "assessing properties, creating cost estimates," and tipping them off before "inspections and audits."  Chris also told the judge at sentencing that he wanted Darlington (and presumably also Marra) "to work fast and be there whenever" he "needed" help with "assessments and processing the jobs."

And there's more.  The evidence shows that Darlington and Marra jiggered contract specifications to boost the brothers' profits.  As an example, CLEAResult found that Darlington had overestimated projects' costs by about $2 million.  And the evidence proves that the Ponzos had "worked the *majority* of" those projects (emphasis added) — meaning they had worked on lots of

"contracts" inflated by Darlington's and Marra's fake numbers (to quote the prosecutor at sentencing, as she parried the brothers' claim that "these contracts were not inflated").   As another example, Marra said in an email that he could "*juice*" a contract price "up" if Joe asked him to (emphasis added).[13]

Darlington and Marra *indisputably* did all this (and more still) while taking the Ponzos' bribes.[14]

Ultimately, Joe's argument is its own undoing.   And that's because he identifies no binding precedent that the judge unquestionably erred *in the context of this record* by saying that money made from contracts tainted by bribes — regardless of who

---

[13] The prosecutor put it nicely below:

> Now, [Chris] makes much of the fact that he purportedly brought in a bunch of referrals, but once those referrals are brought in, they still have to be approved. Somebody has to go to that job site and say, yeah, this makes sense, we need to do energy efficiency work here.
>
> That's where Darlington and Marra came in.  They approved jobs that didn't need to be approved.  And even if they should have been approved, then they were creating contracts based on false numbers.

[14] The judge observed that it would make zero sense for the brothers to pay well over a "[m]illion [d]ollars" in bribes (something they also admitted to at the change-of-plea hearing) if they only made "less than $200,000" each as they claim (what the judge meant is that common sense suggests bribers don't repeatedly dole out that kind of money to score such relatively low returns).

- 18 -

had generated the jobs — resulted from the crimes he'd pled guilty to.  See, e.g., United States v. Galíndez, 999 F.3d 60, 71 (1st Cir. 2021) (holding that "a plain error is an error that is *indisputable* under current law" (emphasis added)).

**FORFEITURES**

We now turn to Chris's and Joe's problems with the orders requiring them to forfeit $13.2 million and $3.6 million respectively.  Sort of borrowing from a just-rejected argument, the brothers say that the orders flop because they're "comprised almost entirely of untainted proceeds . . . not derived from the fraudulent activity."  Chris adds that miscues in the process denied him his right to contest the forfeiture.  And he also argues that the order is an unconstitutionally excessive fine.  Reviewing any legal questions de novo and any fact issues for clear error (as the parties agree), we reject each challenge.  See United States v. George, 886 F.3d 31, 39 (1st Cir. 2018) (charting the standard of review).

**Proceeds**

"Forfeitures help to ensure that crime does not pay: [t]hey at once punish wrongdoing, deter future illegality, and lessen the economic power of criminal enterprises."  Kaley v. United States, 571 U.S. 320, 323 (2014) (citation modified).  The forfeiture statute here — 18 U.S.C. § 981 (applicable to criminal

- 19 -

offenses via 28 U.S.C. § 2461) — makes property forfeitable if it "constitutes or is derived from proceeds traceable to" the crimes. See 18 U.S.C. § 981(a)(1)(C) (mentioning 18 U.S.C. § 1956(c)(7), which in turn mentions crimes listed in 18 U.S.C § 1961(1), which include § 1343 (relating to wire fraud)).  For cases like this one — "involving . . . lawful services . . . sold or provided in an illegal manner" — "proceeds" means the "amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services."  See 18 U.S.C. § 981(a)(2)(B).

Courts use a "but for" test to see if property is forfeitable.  See United States v. Angiulo, 897 F.2d 1169, 1213 (1st Cir. 1990).  "But for" means that if one thing hadn't occurred then another thing wouldn't have occurred.  See Bostock v. Clayton Cnty., 590 U.S. 644, 656 (2020).  And under "this test, funds are considered proceeds and therefore deemed forfeitable if a person would not have the funds *but for* the criminal offense."  United States v. Farkas, 474 F. App'x 349, 360 (4th Cir. 2012) (citation modified).

The government must prove the but-for nexus between the crimes and the forfeitable proceeds by a "preponderance of the evidence."  United States v. Robertson, 162 F.4th 209, 253 (1st Cir. 2025).  "Preponderance" means that the evidence makes a fact

- 20 -

or a conclusion "more likely true than not."  United States v. Marino, 833 F.3d 1, 8 (1st Cir. 2016).  And declining to close our eyes to reality, we add that calculating forfeiture is hardly "an exact science" — even in the best of circumstances.  See United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011).

Which takes us to the Ponzos' familiar-sounding argument that because Chris "self-generated" nearly all of the contracts their companies performed for CLEAResult, the money they made from those projects isn't criminal "proceeds" — even though they admitted paying CLEAResult staffers bribes related to the contracts.  Their claim has no oomph.  For one, Air Tight wouldn't have worked on *any* contracts without the bribes to Darlington because without the bribes Air Tight wouldn't have become an official CLEAResult contractor.  For another, *no matter* who generated a job, a CLEAResult operative like Darlington or Marra had to scope and approve the proposal for there to be a contract. And for another still, the Ponzos *kept bribing* Darlington and Marra for special favors even *after* contracts got awarded — recall the audit and inspection tip-offs, as just two examples.

A judge "shall order" forfeited all proceeds of the defendant's criminal scheme.  See 28 U.S.C. § 2461(c); see also United States v. Cox, 851 F.3d 113, 127-28 (1st Cir. 2017) (holding that the judge didn't err in requiring the defendant to forfeit

- 21 -

"*all* proceeds [he] received from the convicted transactions . . . as well as *all* proceeds [he] received from uncharged relevant conduct" considered part of the criminal plot (emphases added)). See generally United States v. Monsanto, 491 U.S. 600, 607 (1989) (noting in a related context that "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied").  The bottom line is that the government proved a but-for connection between the Ponzos' bribery crimes and the forfeited proceeds by a preponderance of the evidence (a relatively low standard).[15]   And holding otherwise would turn the crime-doesn't-pay principle on its head.  See Kaley, 571 U.S. at 323.[16]

### Process

Fed. R. Crim. P. 32.2 governs criminal forfeiture. Streamlining things a bit (but without affecting the analysis), a judge "must determine the amount of money that the defendant" will

---

[15] Joe's reply brief argues that the forfeiture order can't stand because "there was no financial loss in this case" (bolding and capitalization omitted).  We needn't get into the nitty-gritty of that argument.  It's enough to say that he waived it by not raising it until the reply brief.  See Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 25 (1st Cir. 2018) (repeating that an "argument not advanced in appellant's opening brief but raised only in reply brief" is "waived").

[16] If anything, Chris's $13.2 million forfeiture figure may be *underinclusive* because it's limited to proceeds from 2014 to 2020 and doesn't include any proceeds from 2013, 2021, or 2022 — even though the scheme ran during those years too.

pay "[a]s soon as practical after" a guilty plea "is accepted." Id. 32.2(b)(1)(A). "Unless doing so is impracticable, the [judge] must [then] enter [a] preliminary order [of forfeiture] sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final." Id. 32.2(b)(2)(B). And "[i]f the forfeiture is contested, on either party's request the [judge] must conduct a hearing." Id. 32.2(b)(1)(B).

After noting these rules, Chris focuses on a series of process-based errors: (*1*) The government didn't file a forfeiture motion before sentencing. (*2*) The government didn't specify until sentencing the exact amount he should forfeit. (*3*) The judge didn't enter a preliminary forfeiture order before sentencing. And (*4*) Chris didn't get to oppose the government's post-sentencing hearing forfeiture motion until after the forfeiture order entered. That's all true. But knowing that "[t]he simplest way" to handle an issue "is often the best" way, see Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 248 (1st Cir. 2013) (citation modified), we excuse any error as harmless, see McIntosh v. United States, 601 U.S. 330, 337, 344-45 (2024) (discussing harmless error in a similar situation).

Chris doesn't dispute that the government made clear in the indictment and at the guilty-plea hearing that it sought

- 23 -

forfeiture of all proceeds traceable to his crimes. More (and contrary to what he claims), the government's sentencing memo mentioned forfeiture — right after noting that "the Mass Save program" paid him "to the tune of over $13 million in personal profit."[17] More still, he didn't object when the government orally moved at sentencing for him to forfeit "approximately [$]13.2 million" or when the judge asked the government to file a formal forfeiture motion "[w]ithin one week."[18] Even more, despite his not getting a chance to contest the government's motion until after the forfeiture order entered, the record indicates that his raising those arguments sooner wouldn't have mattered. The reason is that he did file an opposition with his motion for reconsideration

---

[17] The government's brief points to its sentencing memo, where the prosecutors raised the "over $13 million" sum in discussing USSG § 2B1.1 — a provision that escalates the defendants' "offense level[s] based on the amount of loss attributable to [their] fraud." See Robertson, 162 F.4th at 246 (quoting United States v. Kumar, 112 F.4th 30, 36 (1st Cir. 2024)); see also USSG § 2B1.1(b)(1) n.(B) (signaling that "loss" could even mean "the gain that resulted from the offense" if "there is a loss but it reasonably cannot be determined"). Forfeiture and loss (by and large) share some similarities, though (importantly) the two require distinct calculations. See Robertson, 162 F.4th at 255. But Chris makes no argument that we can't use the sentencing memo's "over $13 million" statement for harmless-error purposes.

[18] Chris writes that the prosecutor told the judge "that she 'forgot' about forfeiture" (only the part in single quotation marks is from her remarks). But what the prosecutor said is that she wanted "to make a couple of points that [she] forgot to make earlier" (meaning earlier *in the hearing*), one of which concerned moving for forfeiture.

(along with a motion to stay the forfeiture ruling), an opposition the judge considered and rejected as unconvincing — as we do today as well. Tellingly, the government identified these signs of harmlessness in its answering brief without any persuasive pushback from Chris in his reply brief.[19]

### Fine

Chris lastly argues that the $13.2 million forfeiture order is an excessive fine under the Eighth Amendment to our Constitution.[20] But to get anywhere, he must show that the

---

[19] Speaking of his reply brief, Chris writes there that "the *government* [hasn't] agreed to this day that [he] was entitled to a hearing on traceability" (emphasis added). But this isn't an argument that the *judge* erred on this score (his opposition (filed with his reconsideration motion) didn't say — in Rule 32.2(b)(1)(B) lingo — that he "request[ed]" a forfeiture hearing and that the judge denied that request). And if he thinks it is, he waived the argument for at least two reasons: first, by not raising it "squarely and distinctly," see Alston v. Town of Brookline, 997 F.3d 23, 41 (1st Cir. 2021) (citation modified); see also Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (holding that "we consider waived arguments confusingly constructed" (citation modified)); and second, by debuting it in his reply brief, see Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 43-44 (1st Cir. 2010) (holding that claims cursorily made in an opening brief are waived, adding that "[t]he slight development in [a] reply brief does nothing to help matters" because claims "raised there for the first time come too late to be preserved on appeal").

[20] "Forfeitures are subject to the Eighth Amendment's excessive fines clause 'if they constitute punishment for an offense.'" United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005) (quoting United States v. Bajakajian, 524 U.S. 321, 328 (1998)). And "[h]ere, forfeiture was 'imposed at the culmination of a criminal proceeding and requires conviction of an underlying

forfeiture "is grossly disproportional to the gravity of [his] offense."  See Bajakajian, 524 U.S. at 334.  And the factors that go into the proportionality analysis are:   "(*1*) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (*2*) other penalties authorized by the legislature (or the Sentencing Commission); and (*3*) the harm caused by the defendant."  Heldeman, 402 F.3d at 223 (citing Bajakajian, 524 U.S. at 337-40).[21]

For starters, Chris's conduct places him at the *dead center* of the class of persons at whom the honest-services statutes he pled guilty to are directed (factor (*1*)) — given how he paid

_____

felony'" and so "was punishment for the offense."  Id. (quoting Bajakajian, 524 U.S. at 328).

    [21] The government argues that this circuit's rule is that forfeiture of all proceeds "is *never* excessive" (emphasis added).  Quoting United States v. Candelaria-Silva, 166 F.3d 19, 44 (1st Cir. 1999), the government writes:  "[F]orfeiture of the full amount of the proceeds of their criminal offense . . . does not constitute an unconstitutionally excessive fine" (alterations by the government).  But the actual quote reads:  "*It is well-established that criminal defendants are jointly and severally liable for* forfeiture of the full amount of the proceeds of their criminal offense, and that the imposition of such a forfeiture judgment does not constitute an unconstitutionally excessive fine."  Id. (emphasis added to highlight language the government omitted).  See generally United States v. Elias, 154 F.4th 56, 68-69 (2d Cir. 2025) (discussing whether the reasoning of Honeycutt v. United States, 581 U.S. 443 (2017) (holding that 21 U.S.C. § 853(a)(1) bars joint and several liability for forfeiture judgments), applies to 18 U.S.C. § 981(a)(1)(C)).  Context always matters.  See United States v. Torres-Meléndez, 28 F.4th 339, 342 (1st Cir. 2022).  And Candelaria-Silva's context undermines the government's Candelaria-Silva-centric argument.

bribes for special treatment that led to his making millions (and we do mean *millions*) in profits.  And that's so regardless of how (to quote his brief) "generous" he was with "people in need" after "he began to do very well."

What's more (as we consider factor (*2*)), "judgments about the appropriate punishment for an offense belong in the first instance to the legislature."  See Bajakajian, 524 U.S. at 336; see also United States v. Carpenter, 941 F.3d 1, 11 (1st Cir. 2019).  And pertinently, the top fine for Chris's crimes is "not more than . . . twice the *gross* gain."  See 18 U.S.C. § 3571(d) (emphasis added).  Doubling the roughly $36 million in *gross* proceeds produces a $72 million ceiling.  See Carpenter, 941 F.3d at 11 (repeating that "[w]e give great weight to this statutory judgment by Congress").  And the challenged $13.2 million forfeiture — capturing Chris's *net* gains for *some* of the years the scheme lasted — is well below the $72 million ceiling.[22]  See

---

[22] As Chris points out, a footnote in United States v. Beras says "that the maximum penalties provided under the [g]uidelines should be given greater weight than the statute because the [g]uidelines take into consideration the culpability of the individual defendant."  See 183 F.3d 22, 29 n.5 (1st Cir. 1999). And he tells us with no disagreement from the government that "the maximum guidelines fine" for him "is $75,000."  See USSG § 5E1.2(c)(3).  But Beras's "caution does not mean that any fine exceeding the [g]uidelines, yet within the statutory maximum, becomes *per se* unconstitutional."  United States v. Facteau, 89 F.4th 1, 45 (1st Cir. 2023).  The guidelines say that the Sentencing "Commission envisions that for most defendants, the maximum of the guideline fine range . . . will be at least *twice*

generally United States v. Segal, 495 F.3d 826, 840 (7th Cir. 2007) (applying Bajakajian and holding that "[w]hen a defendant commits a multimillion-dollar crime, he can be required to forfeit assets also running into the millions").

Chris claims (on the factor-(*3*) front) that "[e]veryone affected by" his crimes "was enriched" by his work (or to use his alternative phrasing, no one suffered "financial loss") — especially "CLEAResult, the supposed victim."  But (without opining one way or the other on the enrichment issue) his crimes corrupted the Mass Save program in at least three ways:  by damaging the utilities' confidence in the companies approving and overseeing the projects; by corroding CLEAResult's faith in its workers; and by eroding the public's trust in the program — points the government makes in its brief without any denial from Chris in his reply brief.

## CLOSING

We *affirm* the sentences and the forfeitures.

---

*the amount of the gain* . . . resulting from the offense."  USSG § 5E1.2 cmt. n.4 (emphasis added).  And when that's "not the case, the [g]uidelines state that 'an upward departure from the fine guideline may be warranted.'"  Carpenter, 941 F.3d at 11 n.8 (quoting USSG § 5E1.2 cmt. n.4).  Relying on this language, Carpenter "ultimately upheld a forfeiture of $14 million, which dwarfed the maximum guideline[s] [fine] of $100,000."  Facteau, 89 F.4th at 45 (discussing Carpenter).  And just like in Carpenter, "the statutory scheme is a better guide to whether the forfeiture order is excessive."  See 941 F.3d at 11 n.8.

- 28 -